(Slip Opinion) OCTOBER TERM, 2015 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FISHER *v.* UNIVERSITY OF TEXAS AT AUSTIN ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 14–981.   Argued December 9, 2015—Decided June 23, 2016

The University of Texas at Austin (University) uses an undergraduate admissions system containing two components. First, as required by the State's Top Ten Percent Law, it offers admission to any students who graduate from a Texas high school in the top 10% of their class. It then fills the remainder of its incoming freshman class, some 25%, by combining an applicant's "Academic Index"—the student's SAT score and high school academic performance—with the applicant's "Personal Achievement Index," a holistic review containing numerous factors, including race. The University adopted its current admissions process in 2004, after a year-long-study of its admissions process—undertaken in the wake of *Grutter* v. *Bollinger*, 539 U. S. 306, and *Gratz* v. *Bollinger*, 539 U. S. 244—led it to conclude that its prior race-neutral system did not reach its goal of providing the educational benefits of diversity to its undergraduate students.

Petitioner Abigail Fisher, who was not in the top 10% of her high school class, was denied admission to the University's 2008 freshman class. She filed suit, alleging that the University's consideration of race as part of its holistic-review process disadvantaged her and other Caucasian applicants, in violation of the Equal Protection Clause. The District Court entered summary judgment in the University's favor, and the Fifth Circuit affirmed. This Court vacated the judgment, *Fisher* v. *University of Tex. at Austin*, 570 U. S. ___ (*Fisher I*), and remanded the case to the Court of Appeals, so the University's program could be evaluated under the proper strict scrutiny standard. On remand, the Fifth Circuit again affirmed the entry of summary judgment for the University.

*Held*: The race-conscious admissions program in use at the time of petitioner's application is lawful under the Equal Protection Clause.

Pp. 6–20.

    (a) *Fisher I* sets out three controlling principles relevant to assessing the constitutionality of a public university's affirmative action program.  First, a university may not consider race "unless the admissions process can withstand strict scrutiny," *i.e.*, it must show that its "purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary" to accomplish that purpose.  570 U. S., at ___.  Second, "the decision to pursue the educational benefits that flow from student body diversity is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper."  *Id.,* at ___.  Third, when determining whether the use of race is narrowly tailored to achieve the university's permissible goals, the school bears the burden of demonstrating that "available" and "workable" "race-neutral alternatives" do not suffice.  *Id.,* at ___.  Pp. 6–8.

    (b) The University's approach to admissions gives rise to an unusual consequence here.  The component with the largest impact on petitioner's chances of admission was not the school's consideration of race under its holistic-review process but the Top Ten Percent Plan.  Because petitioner did not challenge the percentage part of the plan, the record is devoid of evidence of its impact on diversity.  Remand for further factfinding would serve little purpose, however, because at the time of petitioner's application, the current plan had been in effect only three years and, in any event, the University lacked authority to alter the percentage plan, which was mandated by the Texas Legislature.  These circumstances refute any criticism that the University did not make good faith efforts to comply with the law.  The University, however, does have a continuing obligation to satisfy the strict scrutiny burden: by periodically reassessing the admission program's constitutionality, and efficacy, in light of the school's experience and the data it has gathered since adopting its admissions plan, and by tailoring its approach to ensure that race plays no greater role than is necessary to meet its compelling interests.  Pp. 8–11.

    (c) Drawing all reasonable inferences in her favor, petitioner has not shown by a preponderance of the evidence that she was denied equal treatment at the time her application was rejected.  Pp. 11–19.

    (1) Petitioner claims that the University has not articulated its compelling interest with sufficient clarity because it has failed to state more precisely what level of minority enrollment would constitute a "critical mass."  However, the compelling interest that justifies consideration of race in college admissions is not an interest in enrolling a certain number of minority students, but an interest in obtaining "the educational benefits that flow from student body diversity." *Fisher I*, 570 U. S., at ___.  Since the University is prohibited from

Syllabus

seeking a particular number or quota of minority students, it cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained.

On the other hand, asserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them. The record here reveals that the University articulated concrete and precise goals—*e.g.,* ending stereotypes, promoting "cross-racial understanding," preparing students for "an increasingly diverse workforce and society," and cultivating leaders with "legitimacy in the eyes of the citizenry"—that mirror the compelling interest this Court has approved in prior cases. It also gave a "reasoned, principled explanation" for its decision, *id.,* at \_\_\_, in a 39-page proposal written after a year-long study revealed that its race-neutral policies and programs did not meet its goals. Pp. 11–13.

(2) Petitioner also claims that the University need not consider race because it had already "achieved critical mass" by 2003 under the Top Ten Percent Plan and race-neutral holistic review. The record, however, reveals that the University studied and deliberated for months, concluding that race-neutral programs had not achieved the University's diversity goals, a conclusion supported by significant statistical and anecdotal evidence. Pp. 13–15.

(3) Petitioner argues further that it was unnecessary to consider race because such consideration had only a minor impact on the number of minority students the school admitted. But the record shows that the consideration of race has had a meaningful, if still limited, effect on freshman class diversity. That race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality. P. 15.

(4) Finally, petitioner argues that there were numerous other race-neutral means to achieve the University's goals. However, as the record reveals, none of those alternatives was a workable means of attaining the University's educational goals, as of the time of her application. Pp. 15–19.

758 F. 3d 633, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. THOMAS, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 14–981

ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY OF TEXAS AT AUSTIN, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2016]

JUSTICE KENNEDY delivered the opinion of the Court.

The Court is asked once again to consider whether the race-conscious admissions program at the University of Texas is lawful under the Equal Protection Clause.

I

The University of Texas at Austin (or University) relies upon a complex system of admissions that has undergone significant evolution over the past two decades. Until 1996, the University made its admissions decisions primarily based on a measure called "Academic Index" (or AI), which it calculated by combining an applicant's SAT score and academic performance in high school. In assessing applicants, preference was given to racial minorities.

In 1996, the Court of Appeals for the Fifth Circuit invalidated this admissions system, holding that any consideration of race in college admissions violates the Equal Protection Clause. See *Hopwood* v. *Texas*, 78 F. 3d 932, 934–935, 948.

One year later the University adopted a new admissions policy. Instead of considering race, the University began

making admissions decisions based on an applicant's AI and his or her "Personal Achievement Index" (PAI). The PAI was a numerical score based on a holistic review of an application. Included in the number were the applicant's essays, leadership and work experience, extracurricular activities, community service, and other "special characteristics" that might give the admissions committee insight into a student's background. Consistent with *Hopwood*, race was not a consideration in calculating an applicant's AI or PAI.

The Texas Legislature responded to *Hopwood* as well. It enacted H. B. 588, commonly known as the Top Ten Percent Law. Tex. Educ. Code Ann. §51.803 (West Cum. Supp. 2015). As its name suggests, the Top Ten Percent Law guarantees college admission to students who graduate from a Texas high school in the top 10 percent of their class. Those students may choose to attend any of the public universities in the State.

The University implemented the Top Ten Percent Law in 1998. After first admitting any student who qualified for admission under that law, the University filled the remainder of its incoming freshman class using a combination of an applicant's AI and PAI scores—again, without considering race.

The University used this admissions system until 2003, when this Court decided the companion cases of *Grutter* v. *Bollinger*, 539 U. S. 306, and *Gratz* v. *Bollinger*, 539 U. S. 244. In *Gratz*, this Court struck down the University of Michigan's undergraduate system of admissions, which at the time allocated predetermined points to racial minority candidates. See 539 U. S., at 255, 275–276. In *Grutter*, however, the Court upheld the University of Michigan Law School's system of holistic review—a system that did not mechanically assign points but rather treated race as a relevant feature within the broader context of a candidate's application. See 539 U. S., at 337, 343–344. In

upholding this nuanced use of race, *Grutter* implicitly overruled *Hopwood*'s categorical prohibition.

In the wake of *Grutter*, the University embarked upon a year-long study seeking to ascertain whether its admissions policy was allowing it to provide "the educational benefits of a diverse student body . . . to all of the University's undergraduate students." App. 481a–482a (affidavit of N. Bruce Walker ¶11 (Walker Aff.)); see also *id.,* at 445a–447a. The University concluded that its admissions policy was not providing these benefits. Supp. App. 24a–25a.

To change its system, the University submitted a proposal to the Board of Regents that requested permission to begin taking race into consideration as one of "the many ways in which [an] academically qualified individual might contribute to, and benefit from, the rich, diverse, and challenging educational environment of the University." *Id.*, at 23a. After the board approved the proposal, the University adopted a new admissions policy to implement it. The University has continued to use that admissions policy to this day.

Although the University's new admissions policy was a direct result of *Grutter*, it is not identical to the policy this Court approved in that case. Instead, consistent with the State's legislative directive, the University continues to fill a significant majority of its class through the Top Ten Percent Plan (or Plan). Today, up to 75 percent of the places in the freshman class are filled through the Plan. As a practical matter, this 75 percent cap, which has now been fixed by statute, means that, while the Plan continues to be referenced as a "Top Ten Percent Plan," a student actually needs to finish in the top seven or eight percent of his or her class in order to be admitted under this category.

The University did adopt an approach similar to the one in *Grutter* for the remaining 25 percent or so of the incom-

ing class. This portion of the class continues to be admitted based on a combination of their AI and PAI scores. Now, however, race is given weight as a subfactor within the PAI. The PAI is a number from 1 to 6 (6 is the best) that is based on two primary components. The first component is the average score a reader gives the applicant on two required essays. The second component is a full-file review that results in another 1-to-6 score, the "Personal Achievement Score" or PAS. The PAS is determined by a separate reader, who (1) rereads the applicant's required essays, (2) reviews any supplemental information the applicant submits (letters of recommendation, resumes, an additional optional essay, writing samples, artwork, etc.), and (3) evaluates the applicant's potential contributions to the University's student body based on the applicant's leadership experience, extracurricular activities, awards/honors, community service, and other "special circumstances."

"Special circumstances" include the socioeconomic status of the applicant's family, the socioeconomic status of the applicant's school, the applicant's family responsibilities, whether the applicant lives in a single-parent home, the applicant's SAT score in relation to the average SAT score at the applicant's school, the language spoken at the applicant's home, and, finally, the applicant's race. See App. 218a–220a, 430a.

Both the essay readers and the full-file readers who assign applicants their PAI undergo extensive training to ensure that they are scoring applicants consistently. Deposition of Brian Breman 9–14, Record in No. 1: 08–CV–00263, (WD Tex.), Doc. 96–3. The Admissions Office also undertakes regular "reliability analyses" to "measure the frequency of readers scoring within one point of each other." App. 474a (affidavit of Gary M. Lavergne ¶8); see also *id.,* at 253a (deposition of Kedra Ishop (Ishop Dep.)). Both the intensive training and the reliability analyses

aim to ensure that similarly situated applicants are being treated identically regardless of which admissions officer reads the file.

Once the essay and full-file readers have calculated each applicant's AI and PAI scores, admissions officers from each school within the University set a cutoff PAI/AI score combination for admission, and then admit all of the applicants who are above that cutoff point. In setting the cutoff, those admissions officers only know how many applicants received a given PAI/AI score combination. They do not know what factors went into calculating those applicants' scores. The admissions officers who make the final decision as to whether a particular applicant will be admitted make that decision without knowing the applicant's race. Race enters the admissions process, then, at one stage and one stage only—the calculation of the PAS.

Therefore, although admissions officers can consider race as a positive feature of a minority student's application, there is no dispute that race is but a "factor of a factor of a factor" in the holistic-review calculus. 645 F. Supp. 2d 587, 608 (WD Tex. 2009). Furthermore, consideration of race is contextual and does not operate as a mechanical plus factor for underrepresented minorities. *Id.*, at 606 ("Plaintiffs cite no evidence to show racial groups other than African-Americans and Hispanics are *excluded* from benefitting from UT's consideration of race in admissions. As the Defendants point out, the consideration of race, within the full context of the entire application, may be beneficial to any UT Austin applicant— including whites and Asian-Americans"); see also Brief for Asian American Legal Defense and Education Fund et al. as *Amici Curiae* 12 (the contention that the University discriminates against Asian-Americans is "entirely unsupported by evidence in the record or empirical data"). There is also no dispute, however, that race, when considered in conjunction with other aspects of an applicant's

background, can alter an applicant's PAS score. Thus, race, in this indirect fashion, considered with all of the other factors that make up an applicant's AI and PAI scores, can make a difference to whether an application is accepted or rejected.

Petitioner Abigail Fisher applied for admission to the University's 2008 freshman class. She was not in the top 10 percent of her high school class, so she was evaluated for admission through holistic, full-file review. Petitioner's application was rejected.

Petitioner then filed suit alleging that the University's consideration of race as part of its holistic-review process disadvantaged her and other Caucasian applicants, in violation of the Equal Protection Clause. See U. S. Const., Amdt. 14, §1 (no State shall "deny to any person within its jurisdiction the equal protection of the laws"). The District Court entered summary judgment in the University's favor, and the Court of Appeals affirmed.

This Court granted certiorari and vacated the judgment of the Court of Appeals, *Fisher* v. *University of Tex. at Austin,* 570 U. S. ___ (2013) (*Fisher I*), because it had applied an overly deferential "good-faith" standard in assessing the constitutionality of the University's program. The Court remanded the case for the Court of Appeals to assess the parties' claims under the correct legal standard.

Without further remanding to the District Court, the Court of Appeals again affirmed the entry of summary judgment in the University's favor. 758 F. 3d 633 (CA5 2014). This Court granted certiorari for a second time, 576 U. S. ___ (2015), and now affirms.

## II

*Fisher I* set forth three controlling principles relevant to assessing the constitutionality of a public university's affirmative-action program. First, "because racial charac-

teristics so seldom provide a relevant basis for disparate treatment," *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 505 (1989), "[r]ace may not be considered [by a university] unless the admissions process can withstand strict scrutiny," *Fisher I*, 570 U. S., at \_\_\_ (slip op., at 7). Strict scrutiny requires the university to demonstrate with clarity that its "'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose.'" *Ibid.*

Second, *Fisher I* confirmed that "the decision to pursue 'the educational benefits that flow from student body diversity' . . . is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper." *Id.*, at \_\_\_ (slip op, at 9). A university cannot impose a fixed quota or otherwise "define diversity as 'some specified percentage of a particular group merely because of its race or ethnic origin.'" *Ibid.* Once, however, a university gives "a reasoned, principled explanation" for its decision, deference must be given "to the University's conclusion, based on its experience and expertise, that a diverse student body would serve its educational goals." *Ibid.* (internal quotation marks and citation omitted).

Third, *Fisher I* clarified that no deference is owed when determining whether the use of race is narrowly tailored to achieve the university's permissible goals. *Id.*, at \_\_\_ (slip op., at 10). A university, *Fisher I* explained, bears the burden of proving a "nonracial approach" would not promote its interest in the educational benefits of diversity "about as well and at tolerable administrative expense." *Id.*, at \_\_\_ (slip op., at 11) (internal quotation marks omitted). Though "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative" or "require a university to choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial

groups," *Grutter*, 539 U. S., at 339, it does impose "on the university the ultimate burden of demonstrating" that "race-neutral alternatives" that are both "available" and "workable" "do not suffice." *Fisher I*, 570 U. S., at ___ (slip op., at 11).

*Fisher I* set forth these controlling principles, while taking no position on the constitutionality of the admissions program at issue in this case. The Court held only that the District Court and the Court of Appeals had "confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith in its use of racial classifications." *Id.,* at ___ (slip op., at 12) The Court remanded the case, with instructions to evaluate the record under the correct standard and to determine whether the University had made "a showing that its plan is narrowly tailored to achieve" the educational benefits that flow from diversity. *Id.,* at ___ (slip op., at 13). On remand, the Court of Appeals determined that the program conformed with the strict scrutiny mandated by *Fisher I*. See 758 F. 3d, at 659–660. Judge Garza dissented.

## III

The University's program is *sui generis*. Unlike other approaches to college admissions considered by this Court, it combines holistic review with a percentage plan. This approach gave rise to an unusual consequence in this case: The component of the University's admissions policy that had the largest impact on petitioner's chances of admission was not the school's consideration of race under its holistic-review process but rather the Top Ten Percent Plan. Because petitioner did not graduate in the top 10 percent of her high school class, she was categorically ineligible for more than three-fourths of the slots in the incoming freshman class. It seems quite plausible, then, to think that petitioner would have had a better chance of

being admitted to the University if the school used race-conscious holistic review to select its entire incoming class, as was the case in *Grutter*.

Despite the Top Ten Percent Plan's outsized effect on petitioner's chances of admission, she has not challenged it. For that reason, throughout this litigation, the Top Ten Percent Plan has been taken, somewhat artificially, as a given premise.

Petitioner's acceptance of the Top Ten Percent Plan complicates this Court's review. In particular, it has led to a record that is almost devoid of information about the students who secured admission to the University through the Plan. The Court thus cannot know how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review.

In an ordinary case, this evidentiary gap perhaps could be filled by a remand to the district court for further factfinding. When petitioner's application was rejected, however, the University's combined percentage-plan/holistic-review approach to admission had been in effect for just three years. While studies undertaken over the eight years since then may be of significant value in determining the constitutionality of the University's current admissions policy, that evidence has little bearing on whether petitioner received equal treatment when her application was rejected in 2008. If the Court were to remand, therefore, further factfinding would be limited to a narrow 3-year sample, review of which might yield little insight.

Furthermore, as discussed above, the University lacks any authority to alter the role of the Top Ten Percent Plan in its admissions process. The Plan was mandated by the Texas Legislature in the wake of *Hopwood*, so the University, like petitioner in this litigation, has likely taken the Plan as a given since its implementation in 1998. If the University had no reason to think that it could deviate

from the Top Ten Percent Plan, it similarly had no reason to keep extensive data on the Plan or the students admitted under it—particularly in the years before *Fisher I* clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review.

Under the circumstances of this case, then, a remand would do nothing more than prolong a suit that has already persisted for eight years and cost the parties on both sides significant resources. Petitioner long since has graduated from another college, and the University's policy—and the data on which it first was based—may have evolved or changed in material ways.

The fact that this case has been litigated on a somewhat artificial basis, furthermore, may limit its value for prospective guidance. The Texas Legislature, in enacting the Top Ten Percent Plan, cannot much be criticized, for it was responding to *Hopwood*, which at the time was binding law in the State of Texas. That legislative response, in turn, circumscribed the University's discretion in crafting its admissions policy. These circumstances refute any criticism that the University did not make good-faith efforts to comply with the law.

That does not diminish, however, the University's continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances. The University engages in periodic reassessment of the constitutionality, and efficacy, of its admissions program. See Supp. App. 32a; App. 448a. Going forward, that assessment must be undertaken in light of the experience the school has accumulated and the data it has gathered since the adoption of its admissions plan.

As the University examines this data, it should remain mindful that diversity takes many forms. Formalistic racial classifications may sometimes fail to capture diversity in all of its dimensions and, when used in a divisive manner, could undermine the educational benefits the

University values. Through regular evaluation of data and consideration of student experience, the University must tailor its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest. The University's examination of the data it has acquired in the years since petitioner's application, for these reasons, must proceed with full respect for the constraints imposed by the Equal Protection Clause. The type of data collected, and the manner in which it is considered, will have a significant bearing on how the University must shape its admissions policy to satisfy strict scrutiny in the years to come. Here, however, the Court is necessarily limited to the narrow question before it: whether, drawing all reasonable inferences in her favor, petitioner has shown by a preponderance of the evidence that she was denied equal treatment at the time her application was rejected.

## IV

In seeking to reverse the judgment of the Court of Appeals, petitioner makes four arguments. First, she argues that the University has not articulated its compelling interest with sufficient clarity. According to petitioner, the University must set forth more precisely the level of minority enrollment that would constitute a "critical mass." Without a clearer sense of what the University's ultimate goal is, petitioner argues, a reviewing court cannot assess whether the University's admissions program is narrowly tailored to that goal.

As this Court's cases have made clear, however, the compelling interest that justifies consideration of race in college admissions is not an interest in enrolling a certain number of minority students. Rather, a university may institute a race-conscious admissions program as a means of obtaining "the educational benefits that flow from student body diversity." *Fisher I*, 570 U. S., at ___ (slip op., at

9) (internal quotation marks omitted); see also *Grutter*, 539 U. S., at 328. As this Court has said, enrolling a diverse student body "promotes cross-racial understanding, helps to break down racial stereotypes, and enables students to better understand persons of different races." *Id.*, at 330 (internal quotation marks and alteration omitted). Equally important, "student body diversity promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society." *Ibid.* (internal quotation marks omitted).

Increasing minority enrollment may be instrumental to these educational benefits, but it is not, as petitioner seems to suggest, a goal that can or should be reduced to pure numbers. Indeed, since the University is prohibited from seeking a particular number or quota of minority students, it cannot be faulted for failing to specify the particular level of minority enrollment at which it believes the educational benefits of diversity will be obtained.

On the other hand, asserting an interest in the educational benefits of diversity writ large is insufficient. A university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them.

The record reveals that in first setting forth its current admissions policy, the University articulated concrete and precise goals. On the first page of its 2004 "Proposal to Consider Race and Ethnicity in Admissions," the University identifies the educational values it seeks to realize through its admissions process: the destruction of stereotypes, the "'promot[ion of] cross-racial understanding,'" the preparation of a student body "'for an increasingly diverse workforce and society,'" and the "'cultivat[ion of] a set of leaders with legitimacy in the eyes of the citizenry.'" Supp. App. 1a; see also *id.,* at 69a; App. 314a–315a (deposition of N. Bruce Walker (Walker Dep.)), 478a–479a (Walker Aff. ¶4) (setting forth the same goals). Later in

the proposal, the University explains that it strives to provide an "academic environment" that offers a "robust exchange of ideas, exposure to differing cultures, preparation for the challenges of an increasingly diverse workforce, and acquisition of competencies required of future leaders." Supp. App. 23a. All of these objectives, as a general matter, mirror the "compelling interest" this Court has approved in its prior cases.

The University has provided in addition a "reasoned, principled explanation" for its decision to pursue these goals. *Fisher I, supra,* at \_\_\_ (slip op., at 9). The University's 39-page proposal was written following a year-long study, which concluded that "[t]he use of race-neutral policies and programs ha[d] not been successful" in "provid[ing] an educational setting that fosters cross-racial understanding, provid[ing] enlightened discussion and learning, [or] prepar[ing] students to function in an increasingly diverse workforce and society." Supp. App. 25a; see also App. 481a–482a (Walker Aff. ¶¶8–12) (describing the "thoughtful review" the University undertook when it faced the "important decision . . . whether or not to use race in its admissions process"). Further support for the University's conclusion can be found in the depositions and affidavits from various admissions officers, all of whom articulate the same, consistent "reasoned, principled explanation." See, *e.g., id.,* at 253a (Ishop Dep.), 314a–318a, 359a (Walker Dep.), 415a–416a (Defendant's Statement of Facts), 478a–479a, 481a–482a (Walker Aff. ¶¶4, 10–13). Petitioner's contention that the University's goal was insufficiently concrete is rebutted by the record.

Second, petitioner argues that the University has no need to consider race because it had already "achieved critical mass" by 2003 using the Top Ten Percent Plan and race-neutral holistic review. Brief for Petitioner 46. Petitioner is correct that a university bears a heavy burden in showing that it had not obtained the educational

benefits of diversity before it turned to a race-conscious plan. The record reveals, however, that, at the time of petitioner's application, the University could not be faulted on this score. Before changing its policy the University conducted "months of study and deliberation, including retreats, interviews, [and] review of data," App. 446a, and concluded that "[t]he use of race-neutral policies and programs ha[d] not been successful in achieving" sufficient racial diversity at the University, Supp. App. 25a. At no stage in this litigation has petitioner challenged the University's good faith in conducting its studies, and the Court properly declines to consider the extrarecord materials the dissent relies upon, many of which are tangential to this case at best and none of which the University has had a full opportunity to respond to. See, *e.g., post,* at 45–46 (opinion of ALITO, J.) (describing a 2015 report regarding the admission of applicants who are related to "politically connected individuals").

The record itself contains significant evidence, both statistical and anecdotal, in support of the University's position. To start, the demographic data the University has submitted show consistent stagnation in terms of the percentage of minority students enrolling at the University from 1996 to 2002. In 1996, for example, 266 African-American freshmen enrolled, a total that constituted 4.1 percent of the incoming class. In 2003, the year *Grutter* was decided, 267 African-American students enrolled—again, 4.1 percent of the incoming class. The numbers for Hispanic and Asian-American students tell a similar story. See Supp. App. 43a. Although demographics alone are by no means dispositive, they do have some value as a gauge of the University's ability to enroll students who can offer underrepresented perspectives.

In addition to this broad demographic data, the University put forward evidence that minority students admitted under the *Hopwood* regime experienced feelings of loneli-

ness and isolation. See, *e.g.*, App. 317a–318a.

This anecdotal evidence is, in turn, bolstered by further, more nuanced quantitative data. In 2002, 52 percent of undergraduate classes with at least five students had no African-American students enrolled in them, and 27 percent had only one African-American student. Supp. App. 140a. In other words, only 21 percent of undergraduate classes with five or more students in them had more than one African-American student enrolled. Twelve percent of these classes had no Hispanic students, as compared to 10 percent in 1996. *Id.,* at 74a, 140a. Though a college must continually reassess its need for race-conscious review, here that assessment appears to have been done with care, and a reasonable determination was made that the University had not yet attained its goals.

Third, petitioner argues that considering race was not necessary because such consideration has had only a "'minimal impact' in advancing the [University's] compelling interest." Brief for Petitioner 46; see also Tr. of Oral Arg. 23:10–12; 24:13–25:2, 25:24–26:3. Again, the record does not support this assertion. In 2003, 11 percent of the Texas residents enrolled through holistic review were Hispanic and 3.5 percent were African-American. Supp. App. 157a. In 2007, by contrast, 16.9 percent of the Texas holistic-review freshmen were Hispanic and 6.8 percent were African-American. *Ibid.* Those increases—of 54 percent and 94 percent, respectively—show that consideration of race has had a meaningful, if still limited, effect on the diversity of the University's freshman class.

In any event, it is not a failure of narrow tailoring for the impact of racial consideration to be minor. The fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality.

Petitioner's final argument is that "there are numerous other available race-neutral means of achieving" the Uni-

versity's compelling interest.  Brief for Petitioner 47.  A review of the record reveals, however, that, at the time of petitioner's application, none of her proposed alternatives was a workable means for the University to attain the benefits of diversity it sought.  For example, petitioner suggests that the University could intensify its outreach efforts to African-American and Hispanic applicants.  But the University submitted extensive evidence of the many ways in which it already had intensified its outreach efforts to those students.  The University has created three new scholarship programs, opened new regional admissions centers, increased its recruitment budget by half-a-million dollars, and organized over 1,000 recruitment events.  Supp. App. 29a–32a; App. 450a–452a (citing affidavit of Michael Orr ¶¶4–20).  Perhaps more significantly, in the wake of *Hopwood*, the University spent seven years attempting to achieve its compelling interest using race-neutral holistic review.  None of these efforts succeeded, and petitioner fails to offer any meaningful way in which the University could have improved upon them at the time of her application.

Petitioner also suggests altering the weight given to academic and socioeconomic factors in the University's admissions calculus.  This proposal ignores the fact that the University tried, and failed, to increase diversity through enhanced consideration of socioeconomic and other factors.  And it further ignores this Court's precedent making clear that the Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence.  *Grutter*, 539 U. S., at 339.

Petitioner's final suggestion is to uncap the Top Ten Percent Plan, and admit more—if not all—the University's students through a percentage plan.  As an initial matter, petitioner overlooks the fact that the Top Ten Percent Plan, though facially neutral, cannot be understood apart

from its basic purpose, which is to boost minority enroll-
ment. Percentage plans are "adopted with racially segre-
gated neighborhoods and schools front and center stage."
*Fisher I*, 570 U. S., at \_\_\_ (GINSBURG, J., dissenting) (slip
op., at 2). "It is race consciousness, not blindness to race,
that drives such plans." *Ibid.* Consequently, petitioner
cannot assert simply that increasing the University's
reliance on a percentage plan would make its admissions
policy more race neutral.

Even if, as a matter of raw numbers, minority enroll-
ment would increase under such a regime, petitioner
would be hard-pressed to find convincing support for the
proposition that college admissions would be improved if
they were a function of class rank alone. That approach
would sacrifice all other aspects of diversity in pursuit of
enrolling a higher number of minority students. A system
that selected every student through class rank alone
would exclude the star athlete or musician whose grades
suffered because of daily practices and training. It would
exclude a talented young biologist who struggled to main-
tain above-average grades in humanities classes. And it
would exclude a student whose freshman-year grades were
poor because of a family crisis but who got herself back on
track in her last three years of school, only to find herself
just outside of the top decile of her class.

These are but examples of the general problem. Class
rank is a single metric, and like any single metric, it will
capture certain types of people and miss others. This does
not imply that students admitted through holistic review
are necessarily more capable or more desirable than those
admitted through the Top Ten Percent Plan. It merely
reflects the fact that privileging one characteristic above
all others does not lead to a diverse student body. Indeed,
to compel universities to admit students based on class
rank alone is in deep tension with the goal of educational
diversity as this Court's cases have defined it. See *Grut-*

*ter*, *supra*, at 340 (explaining that percentage plans "may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university"); 758 F. 3d, at 653 (pointing out that the Top Ten Percent Law leaves out students "who fell outside their high school's top ten percent but excelled in unique ways that would enrich the diversity of [the University's] educational experience" and "leaves a gap in an admissions process seeking to create the multi-dimensional diversity that [*Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978),] envisions"). At its center, the Top Ten Percent Plan is a blunt instrument that may well compromise the University's own definition of the diversity it seeks.

In addition to these fundamental problems, an admissions policy that relies exclusively on class rank creates perverse incentives for applicants. Percentage plans "encourage parents to keep their children in low-performing segregated schools, and discourage students from taking challenging classes that might lower their grade point averages." *Gratz*, 539 U. S., at 304, n. 10 (GINSBURG, J., dissenting).

For all these reasons, although it may be true that the Top Ten Percent Plan in some instances may provide a path out of poverty for those who excel at schools lacking in resources, the Plan cannot serve as the admissions solution that petitioner suggests. Wherever the balance between percentage plans and holistic review should rest, an effective admissions policy cannot prescribe, realistically, the exclusive use of a percentage plan.

In short, none of petitioner's suggested alternatives—nor other proposals considered or discussed in the course of this litigation—have been shown to be "available" and "workable" means through which the University could have met its educational goals, as it understood and de-

fined them in 2008. *Fisher I*, *supra*, at \_\_\_ (slip op., at 11). The University has thus met its burden of showing that the admissions policy it used at the time it rejected petitioner's application was narrowly tailored.

\*     \*     \*

A university is in large part defined by those intangible "qualities which are incapable of objective measurement but which make for greatness." *Sweatt* v. *Painter*, 339 U. S. 629, 634 (1950). Considerable deference is owed to a university in defining those intangible characteristics, like student body diversity, that are central to its identity and educational mission. But still, it remains an enduring challenge to our Nation's education system to reconcile the pursuit of diversity with the constitutional promise of equal treatment and dignity.

In striking this sensitive balance, public universities, like the States themselves, can serve as "laboratories for experimentation." *United States* v. *Lopez*, 514 U. S. 549, 581 (1995) (KENNEDY, J., concurring); see also *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 311 (1932) (Brandeis, J., dissenting). The University of Texas at Austin has a special opportunity to learn and to teach. The University now has at its disposal valuable data about the manner in which different approaches to admissions may foster diversity or instead dilute it. The University must continue to use this data to scrutinize the fairness of its admissions program; to assess whether changing demographics have undermined the need for a race-conscious policy; and to identify the effects, both positive and negative, of the affirmative-action measures it deems necessary.

The Court's affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement. It is the University's ongoing obligation to engage in constant deliberation and continued reflection regarding its admis-

sions policies.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

————

No. 14–981

————

ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY OF TEXAS AT AUSTIN, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2016]

JUSTICE THOMAS, dissenting.

I join JUSTICE ALITO's dissent. As JUSTICE ALITO explains, the Court's decision today is irreconcilable with strict scrutiny, rests on pernicious assumptions about race, and departs from many of our precedents.

I write separately to reaffirm that "a State's use of race in higher education admissions decisions is categorically prohibited by the Equal Protection Clause." *Fisher* v. *University of Tex. at Austin*, 570 U. S. \_\_\_, \_\_\_ (2013) (THOMAS, J., concurring) (slip op., at 1). "The Constitution abhors classifications based on race because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Id.,* at \_\_\_ (slip op., at 2) (internal quotation marks omitted). That constitutional imperative does not change in the face of a "faddish theor[y]" that racial discrimination may produce "educational benefits." *Id.,* at \_\_\_, \_\_\_ (slip op., at 5, 13). The Court was wrong to hold otherwise in *Grutter* v. *Bollinger*, 539 U. S. 306, 343 (2003). I would overrule *Grutter* and reverse the Fifth Circuit's judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–981

_____

## ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY OF TEXAS AT AUSTIN, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 23, 2016]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

Something strange has happened since our prior decision in this case. See *Fisher* v. *University of Tex. at Austin*, 570 U. S. \_\_\_ (2013) (*Fisher I*). In that decision, we held that strict scrutiny requires the University of Texas at Austin (UT or University) to show that its use of race and ethnicity in making admissions decisions serves compelling interests and that its plan is narrowly tailored to achieve those ends. Rejecting the argument that we should defer to UT's judgment on those matters, we made it clear that UT was obligated (1) to identify the interests justifying its plan with enough specificity to permit a reviewing court to determine whether the requirements of strict scrutiny were met, and (2) to show that those requirements were in fact satisfied. On remand, UT failed to do what our prior decision demanded. The University has still not identified with any degree of specificity the interests that its use of race and ethnicity is supposed to serve. Its primary argument is that merely invoking "the educational benefits of diversity" is sufficient and that it need not identify any metric that would allow a court to determine whether its plan is needed to serve, or is actually serving, those interests. This is nothing less than the plea for deference that we emphatically rejected in our

prior decision.   Today, however, the Court inexplicably grants that request.

To the extent that UT has ever moved beyond a plea for deference and identified the relevant interests in more specific terms, its efforts have been shifting, unpersuasive, and, at times, less than candid.  When it adopted its race-based plan, UT said that the plan was needed to promote classroom diversity.   See Supp. App. 1a, 24a–25a, 39a; App. 316a.   It pointed to a study showing that African-American, Hispanic, and Asian-American students were underrepresented in many classes.  See Supp. App. 26a. But UT has never shown that its race-conscious plan actually ameliorates this situation.  The University presents no evidence that its admissions officers, in administering the "holistic" component of its plan, make any effort to determine whether an African-American, Hispanic, or Asian-American student is likely to enroll in classes in which minority students are underrepresented.   And although UT's records should permit it to determine without much difficulty whether holistic admittees are any more likely than students admitted through the Top Ten Percent Law, Tex. Educ. Code Ann. §51.803 (West Cum. Supp. 2015), to enroll in the classes lacking racial or ethnic diversity, UT either has not crunched those numbers or has not revealed what they show.   Nor has UT explained why the underrepresentation of Asian-American students in many classes justifies its plan, which discriminates *against* those students.

At times, UT has claimed that its plan is needed to achieve a "critical mass" of African-American and Hispanic students, but it has never explained what this term means.  According to UT, a critical mass is neither some absolute number of African-American or Hispanic students nor the percentage of African-Americans or Hispanics in the general population of the State.  The term remains undefined, but UT tells us that it will let the courts

3

know when the desired end has been achieved. See App. 314a–315a. This is a plea for deference—indeed, for blind deference—the very thing that the Court rejected in *Fisher I.*

UT has also claimed at times that the race-based component of its plan is needed because the Top Ten Percent Plan admits *the wrong kind* of African-American and Hispanic students, namely, students from poor families who attend schools in which the student body is predominantly African-American or Hispanic. As UT put it in its brief in *Fisher I*, the race-based component of its admissions plan is needed to admit "[t]he African-American or Hispanic child of successful professionals in Dallas." Brief for Respondents, O. T. 2012, No. 11–345, p. 34.

After making this argument in its first trip to this Court, UT apparently had second thoughts, and in the latest round of briefing UT has attempted to disavow ever having made the argument. See Brief for Respondents 2 ("Petitioner's argument that UT's interest is favoring 'affluent' minorities is a fabrication"); see also *id.*, at 15. But it did, and the argument turns affirmative action on its head. Affirmative-action programs were created to help *disadvantaged* students.

Although UT now disowns the argument that the Top Ten Percent Plan results in the admission of the wrong kind of African-American and Hispanic students, the Fifth Circuit majority bought a version of that claim. As the panel majority put it, the Top Ten African-American and Hispanic admittees cannot match the holistic African-American and Hispanic admittees when it comes to "records of personal achievement," a "variety of perspectives" and "life experiences," and "unique skills." 758 F. 3d 633, 653 (2014). All in all, according to the panel majority, the Top Ten Percent students cannot "enrich the diversity of the student body" in the same way as the holistic admittees. *Id.,* at 654. As Judge Garza put it in dissent, the

panel majority concluded that the Top Ten Percent admittees are "somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review." *Id.*, at 669–670 (Garza, J., dissenting).

The Fifth Circuit reached this conclusion with little direct evidence regarding the characteristics of the Top Ten Percent and holistic admittees. Instead, the assumption behind the Fifth Circuit's reasoning is that most of the African-American and Hispanic students admitted under the race-neutral component of UT's plan were able to rank in the top decile of their high school classes only because they did not have to compete against white and Asian-American students. This insulting stereotype is not supported by the record. African-American and Hispanic students admitted under the Top Ten Percent Plan receive higher college grades than the African-American and Hispanic students admitted under the race-conscious program. See Supp. App. 164a–165a.

It should not have been necessary for us to grant review a second time in this case, and I have no greater desire than the majority to see the case drag on. But that need not happen. When UT decided to adopt its race-conscious plan, it had every reason to know that its plan would have to satisfy strict scrutiny and that this meant that it would be *its burden* to show that the plan was narrowly tailored to serve compelling interests. UT has failed to make that showing. By all rights, judgment should be entered in favor of petitioner.

But if the majority is determined to give UT yet another chance, we should reverse and send this case back to the District Court. What the majority has now done— awarding a victory to UT in an opinion that fails to address the important issues in the case—is simply wrong.

I

Over the past 20 years, UT has frequently modified its

admissions policies, and it has generally employed race and ethnicity in the most aggressive manner permitted under controlling precedent.

Before 1997, race was considered directly as part of the general admissions process, and it was frequently a controlling factor. Admissions were based on two criteria: (1) the applicant's Academic Index (AI), which was computed from standardized test scores and high school class rank, and (2) the applicant's race. In 1996, the last year this race-conscious system was in place, 4.1% of enrolled freshmen were African-American, 14.7% were Asian-American, and 14.5% were Hispanic. Supp. App. 43a.

The Fifth Circuit's decision in *Hopwood* v. *Texas*, 78 F. 3d 932 (1996), prohibited UT from using race in admissions. In response to *Hopwood*, beginning with the 1997 admissions cycle, UT instituted a "holistic review" process in which it considered an applicant's AI as well as a Personal Achievement Index (PAI) that was intended, among other things, to increase minority enrollment. The race-neutral PAI was a composite of scores from two essays and a personal achievement score, which in turn was based on a holistic review of an applicant's leadership qualities, extracurricular activities, honors and awards, work experience, community service, and special circumstances. Special consideration was given to applicants from poor families, applicants from homes in which a language other than English was customarily spoken, and applicants from single-parent households. Because this race-neutral plan gave a preference to disadvantaged students, it had the effect of "disproportionately" benefiting minority candidates. 645 F. Supp. 2d 587, 592 (WD Tex. 2009).

The Texas Legislature also responded to *Hopwood*. In 1997, it enacted the Top Ten Percent Plan, which mandated that UT admit all Texas seniors who rank in the top 10% of their high school classes. This facially race-neutral law served to equalize competition between students who

live in relatively affluent areas with superior schools and students in poorer areas served by schools offering fewer opportunities for academic excellence. And by benefiting the students in the latter group, this plan, like the race-neutral holistic plan already adopted by UT, tended to benefit African-American and Hispanic students, who are often trapped in inferior public schools. 758 F. 3d, at 650–653.

Starting in 1998, when the Top Ten Percent Plan took effect, UT's holistic, race-neutral AI/PAI system continued to be used to fill the seats in the entering class that were not taken by Top Ten Percent students. The AI/PAI system was also used to determine program placement for all incoming students, including the Top Ten Percent students.

"The University's revised admissions process, coupled with the operation of the Top Ten Percent Law, resulted in a more racially diverse environment at the University." *Fisher I*, 570 U. S., at ___ (slip op., at 3). In 2000, UT announced that its "enrollment levels for African American and Hispanic freshmen have returned to those of 1996, the year before the *Hopwood* decision prohibited the consideration of race in admissions policies." App. 393a; see also Supp. App. 23a–24a (pre-*Hopwood* diversity levels were "restored" in 1999); App. 392a–393a ("The 'Top 10 Percent Law' is Working for Texas" and "has enabled us to diversify enrollment at UT Austin with talented students who succeed"). And in 2003, UT proclaimed that it had "effectively compensated for the loss of affirmative action." *Id.,* at 396a; see also *id.*, at 398a ("Diversity efforts at The University of Texas at Austin have brought a higher number of freshman minority students—African Americans, Hispanics and Asian-Americans—to the campus than were enrolled in 1996, the year a court ruling ended the use of affirmative action in the university's enrollment process"). By 2004—the last year under the holistic, race-

neutral AI/PAI system—UT's entering class was 4.5% African-American, 17.9% Asian-American, and 16.9% Hispanic. Supp. App. 156a. The 2004 entering class thus had a higher percentage of African-Americans, Asian-Americans, and Hispanics than the class that entered in 1996, when UT had last employed racial preferences.

Notwithstanding these lauded results, UT leapt at the opportunity to reinsert race into the process. On June 23, 2003, this Court decided *Grutter* v. *Bollinger,* 539 U. S. 306 (2003), which upheld the University of Michigan Law School's race-conscious admissions system. In *Grutter*, the Court warned that a university contemplating the consideration of race as part of its admissions process must engage in "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." *Id.*, at 339. Nevertheless, *on the very day Grutter was handed down*, UT's president announced that "[t]he University of Texas at Austin *will* modify its admissions procedures" in light of *Grutter*, including by "implementing procedures at the undergraduate level that combine the benefits of the Top 10 Percent Law with affirmative action programs." App. 406a–407a (emphasis added).[1] UT purports to have later engaged in

——————

[1] See also Nissimov, UT To Resume Factoring in Applicants' Race: UT To Reintroduce Race-Based Criteria, Houston Chronicle, June 24, 2003, p. 4A ("President Larry Faulkner said Monday his institution will quickly develop race-based admissions criteria by the fall that would be used for the summer and fall of 2004, after being given the green light to do so by Monday's U. S. Supreme Court ruling"); Silverstein, Hong, & Trounson, State Finds Itself Hemmed In, L. A. Times, June 24, 2003, p. A1 (explaining UT's "intention, after dropping race as a consideration, to move swiftly to restore its use in admissions" in time for "the next admissions cycle"); Hart, Texas Ponders Changes to 10% Law, Boston Globe, June 25, 2003, p. A3 ("Soon after Monday's ruling, University of Texas President Larry Faulkner said that the school will overhaul procedures" in order to allow consideration of "[t]he race of an applicant" for "students enrolling in fall 2004"); Ambiguity Remains; High

"almost a year of deliberations," *id.,* at 482a, but there is no evidence that the reintroduction of race into the admissions process was anything other than a foregone conclusion following the president's announcement.

"The University's plan to resume race-conscious admissions was given formal expression in June 2004 in an internal document entitled Proposal to Consider Race and Ethnicity in Admissions" (Proposal). *Fisher I, supra,* at ___ (slip op., at 4). The Proposal stated that UT needed race-conscious admissions because it had not yet achieved a "critical mass of racial diversity." Supp. App. 25a. In support of this claim, UT cited two pieces of evidence. First, it noted that there were "significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population." *Id.,* at 24a. Second, the Proposal "relied in substantial part," *Fisher I, supra,* at ___ (slip op., at 4), on a study of a subset of undergraduate classes containing at least five students, see Supp. App. 26a. The study showed that among select classes with five or more students, 52% had no African-Americans, 16% had no Asian-Americans, and 12% had no Hispanics. *Ibid.* Moreover, the study showed, only 21% of these classes had two or more African-Americans, 67% had two or more Asian-Americans, and 70% had two or more Hispanics. See *ibid.* Based on this study, the Proposal concluded that UT "has not reached a critical mass at the classroom level." *Id.,* at 24a. The Proposal did not analyze the backgrounds, life experiences, leadership qualities, awards, extracurricular activities, community service, personal attributes, or other characteristics of the minority students who were already being

————————

Court Leaves Quota Questions Looming, El Paso Times, June 25, 2003, p. 6B ("The University of Texas at Austin's president, Larry Faulkner, has already announced that new admissions policies would be drafted to include race as a factor").

admitted to UT under the holistic, race-neutral process.

"To implement the Proposal the University included a student's race as a component of the PAI score, beginning with applicants in the fall of 2004." *Fisher I*, 570 U. S., at \_\_\_ (slip op., at 4). "The University asks students to classify themselves from among five predefined racial categories on the application." *Ibid.* "Race is not assigned an explicit numerical value, but it is undisputed that race is a meaningful factor." *Ibid.* UT decided to use racial preferences to benefit African-American and Hispanic students because it considers those groups "underrepresented minorities." Supp. App. 25a; see also App. 445a–446a (defining "underrepresented minorities" as "Hispanic[s] and African Americans"). Even though UT's classroom study showed that more classes lacked Asian-American students than lacked Hispanic students, Supp. App. 26a, UT deemed Asian-Americans "*overrepresented*" based on state demographics, 645 F. Supp. 2d, at 606; see also *ibid.* ("It is undisputed that UT considers African-Americans and Hispanics to be underrepresented but does not consider Asian-Americans to be underrepresented").

Although UT claims that race is but a "factor of a factor of a factor of a factor," *id.*, at 608, UT acknowledges that "race is the only one of [its] holistic factors that appears on the cover of every application," Tr. of Oral Arg. 54 (Oct. 10, 2012). "Because an applicant's race is identified at the front of the admissions file, reviewers are aware of it throughout the evaluation." 645 F. Supp. 2d, at 597; see also *id.,* at 598 ("[A] candidate's race is known throughout the application process"). Consideration of race therefore pervades every aspect of UT's admissions process. See App. 219a ("We are certainly aware of the applicant's race. It's on the front page of the application that's being read [and] is used in context with everything else that's part of the applicant's file"). This is by design, as UT considers its use of racial classifications to be a benign form of "social

engineering." Powers, Why Schools Still Need Affirmative Action, National L. J., Aug. 4, 2014, p. 22 (editorial by Bill Powers, President of UT from 2006–2015) ("Opponents accuse defenders of race-conscious admissions of being in favor of 'social engineering,' to which I believe we should reply, 'Guilty as charged'").

Notwithstanding the omnipresence of racial classifications, UT claims that it keeps no record of how those classifications affect its process. "The university doesn't keep any statistics on how many students are affected by the consideration of race in admissions decisions," and it "does not know how many minority students are affected in a positive manner by the consideration of race." App. 337a. According to UT, it has no way of making these determinations. See *id.,* at 320a–322a. UT says that it does not tell its admissions officers how much weight to give to race. See Deposition of Gary Lavergne 43–45, Record in No. 1:08–CV–00263 (WD Tex.), Doc. 94–9 (Lavergne Deposition). And because the influence of race is always "contextual," UT claims, it cannot provide even a single example of an instance in which race impacted a student's odds of admission. See App. 220a ("Q. Could you give me an example where race would have some impact on an applicant's personal achievement score? A. To be honest, not really . . . . [I]t's impossible to say—to give you an example of a particular student because it's all contextual"). Accordingly, UT asserts that it has no idea which students were admitted as a result of its race-conscious system and which students would have been admitted under a race-neutral process. UT thus makes no effort to assess how the individual characteristics of students admitted as the result of racial preferences differ (or do not differ) from those of students who would have been admitted without them.

## II

UT's race-conscious admissions program cannot satisfy strict scrutiny. UT says that the program furthers its interest in the educational benefits of diversity, but it has failed to define that interest with any clarity or to demonstrate that its program is narrowly tailored to achieve that or any other particular interest. By accepting UT's rationales as sufficient to meet its burden, the majority licenses UT's perverse assumptions about different groups of minority students—the precise assumptions strict scrutiny is supposed to stamp out.

### A

"The moral imperative of racial neutrality is the driving force of the Equal Protection Clause." *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 518 (1989) (KENNEDY, J., concurring in part and concurring in judgment). "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Miller* v. *Johnson*, 515 U. S. 900, 911 (1995) (internal quotation marks omitted). "Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." *Id.,* at 912 (internal quotation marks omitted). Given our constitutional commitment to "the doctrine of equality," "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people.'" *Rice* v. *Cayetano*, 528 U. S. 495, 517 (2000) (quoting *Hirabayashi* v. *United States*, 320 U. S. 81, 100 (1943)).

"[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications . . . be

subjected to the most rigid scrutiny." *Fisher I*, 570 U. S., at ___ (slip op., at 8) (internal quotation marks and citations omitted). "[J]udicial review must begin from the position that 'any official action that treats a person differently on account of his race or ethnic origin is inherently suspect.'" *Ibid.*; see also *Grutter*, 539 U. S., at 388 (KENNEDY, J., dissenting) ("'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination'"). Under strict scrutiny, the use of race must be "necessary to further a compelling governmental interest," and the means employed must be "'specifically and narrowly'" tailored to accomplish the compelling interest. *Id.,* at 327, 333 (O'Connor, J., for the Court).

The "higher education dynamic does not change" this standard. *Fisher I*, *supra*, at ___ (slip op., at 12). "Racial discrimination [is] invidious in all contexts," *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 619 (1991), and "'[t]he analysis and level of scrutiny applied to determine the validity of [a racial] classification do not vary simply because the objective appears acceptable,'" *Fisher I*, *supra*, at ___ (slip op., at 12).

Nor does the standard of review "'depen[d] on the race of those burdened or benefited by a particular classification.'" *Gratz* v. *Bollinger*, 539 U. S. 244, 270 (2003) (quoting *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 224 (1995)); see also *Miller*, *supra*, at 904 ("This rule obtains with equal force regardless of 'the race of those burdened or benefited by a particular classification'" (quoting *Croson*, *supra*, at 494 (plurality opinion of O'Connor, J.)). "Thus, 'any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny.'" *Gratz*, *supra*, at 270 (quoting *Adarand*, *supra*, at 224).

In short, in "all contexts," *Edmonson, supra,* at 619, racial classifications are permitted only "as a last resort," when all else has failed, *Croson, supra,* at 519 (opinion of KENNEDY, J.). "Strict scrutiny is a searching examination, and it is the government that bears the burden" of proof. *Fisher I,* 570 U. S., at ___ (slip op., at 8). To meet this burden, the government must "demonstrate *with clarity* that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose.'" *Id.,* at ___ (slip op., at 7) (emphasis added).

### B

Here, UT has failed to define its interest in using racial preferences with clarity. As a result, the narrow tailoring inquiry is impossible, and UT cannot satisfy strict scrutiny.

When UT adopted its challenged policy, it characterized its compelling interest as obtaining a "'critical mass'" of underrepresented minorities. *Id.,* at ___ (slip op., at 1). The 2004 Proposal claimed that "[t]he use of race-neutral policies and programs has not been successful in achieving a critical mass of racial diversity." Supp. App. 25a; see *Fisher* v. *University of Tex. at Austin,* 631 F. 3d 213, 226 (CA5 2011) ("[T]he *2004 Proposal* explained that UT had not yet achieved the critical mass of underrepresented minority students needed to obtain the full educational benefits of diversity"). But to this day, UT has not explained in anything other than the vaguest terms what it means by "critical mass." In fact, UT argues that it need not identify *any* interest more specific than "securing the educational benefits of diversity." Brief for Respondents 15.

UT has insisted that critical mass is not an absolute number. See Tr. of Oral Arg. 39 (Oct. 10, 2012) (declaring that UT is not working toward any particular number of

African-American or Hispanic students); App. 315a (confirming that UT has not defined critical mass as a number and has not projected when it will attain critical mass). Instead, UT prefers a deliberately malleable "we'll know it when we see it" notion of critical mass. It defines "critical mass" as "an adequate representation of minority students so that the . . . educational benefits that can be derived from diversity can actually happen," and it declares that it "will . . . know [that] it has reached critical mass" when it "see[s] the educational benefits happening." *Id.,* at 314a–315a. In other words: Trust us.

This intentionally imprecise interest is designed to insulate UT's program from meaningful judicial review. As Judge Garza explained:

> "[T]o meet its narrow tailoring burden, the University must explain its goal to us in some meaningful way. We cannot undertake a rigorous ends-to-means narrow tailoring analysis when the University will not define the ends. We cannot tell whether the admissions program closely 'fits' the University's goal when it fails to objectively articulate its goal. Nor can we determine whether considering race is necessary for the University to achieve 'critical mass,' or whether there are effective race-neutral alternatives, when it has not described what 'critical mass' requires." 758 F. 3d, at 667 (dissenting opinion).

Indeed, without knowing in reasonably specific terms what critical mass is or how it can be measured, a reviewing court cannot conduct the requisite "careful judicial inquiry" into whether the use of race was "'necessary.'" *Fisher I*, *supra*, at ___ (slip op., at 10).

To be sure, I agree with the majority that our precedents do not require UT to pinpoint "an interest in enrolling a certain number of minority students." *Ante*, at 11. But in order for us to assess whether UT's program is

narrowly tailored, the University must identify *some sort of concrete interest.* "Classifying and assigning" students according to race "requires more than . . . an amorphous end to justify it." *Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 735 (2007). Because UT has failed to explain "with clarity," *Fisher I*, *supra*, at \_\_\_ (slip op., at 7), why it needs a race-conscious policy and how it will know when its goals have been met, the narrow tailoring analysis cannot be meaningfully conducted. UT therefore cannot satisfy strict scrutiny.

The majority acknowledges that "asserting an interest in the educational benefits of diversity writ large is insufficient," and that "[a] university's goals cannot be elusory or amorphous—they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." *Ante*, at 12. According to the majority, however, UT has articulated the following "concrete and precise goals": "the destruction of stereotypes, the promot[ion of] cross-racial understanding, the preparation of a student body for an increasingly diverse workforce and society, and the cultivat[ion of] a set of leaders with legitimacy in the eyes of the citizenry." *Ibid.* (internal quotation marks omitted).

These are laudable goals, but they are not concrete or precise, and they offer no limiting principle for the use of racial preferences. For instance, how will a court ever be able to determine whether stereotypes have been adequately destroyed? Or whether cross-racial understanding has been adequately achieved? If a university can justify racial discrimination simply by having a few employees opine that racial preferences are necessary to accomplish these nebulous goals, see *ante*, at 12–13 (citing *only* self-serving statements from UT officials), then the narrow tailoring inquiry is meaningless. Courts will be required to defer to the judgment of university administrators, and affirmative-action policies will be completely insulated

from judicial review.

By accepting these amorphous goals as sufficient for UT to carry its burden, the majority violates decades of precedent rejecting blind deference to government officials defending "'inherently suspect'" classifications. *Miller*, 515 U. S., at 904 (citing *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 291 (1978) (opinion of Powell, J.)); see also, *e.g., Miller*, *supra*, at 922 ("Our presumptive skepticism of all racial classifications . . . prohibits us . . . from accepting on its face the Justice Department's conclusion" (citation omitted)); *Croson*, 488 U. S., at 500 ("[T]he mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight"); *id.,* at 501 ("The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis"). Most troublingly, the majority's uncritical deference to UT's self-serving claims blatantly contradicts our decision in the prior iteration of this very case, in which we faulted the Fifth Circuit for improperly "deferring to the University's good faith in its use of racial classifications." *Fisher I*, 570 U. S., at ___ (slip op., at 12). As we emphasized just three years ago, our precedent "ma[kes] clear that it is for the courts, not for university administrators, to ensure that" an admissions process is narrowly tailored. *Id.*, at ___ (slip op., at 10).

A court cannot ensure that an admissions process is narrowly tailored if it cannot pin down the goals that the process is designed to achieve. UT's vague policy goals are "so broad and imprecise that they cannot withstand strict scrutiny." *Parents Involved*, *supra*, at 785 (KENNEDY, J., concurring in part and concurring in judgment).

## C

Although UT's primary argument is that it need not point to any interest more specific than "the educational

benefits of diversity," Brief for Respondents 15, it has—at various points in this litigation—identified four more specific goals: demographic parity, classroom diversity, intraracial diversity, and avoiding racial isolation. Neither UT nor the majority has demonstrated that any of these four goals provides a sufficient basis for satisfying strict scrutiny. And UT's arguments to the contrary depend on a series of invidious assumptions.

1

First, both UT and the majority cite demographic data as evidence that African-American and Hispanic students are "underrepresented" at UT and that racial preferences are necessary to compensate for this underrepresentation. See, *e.g.,* Supp. App. 24a; *ante*, at 14. But neither UT nor the majority is clear about the relationship between Texas demographics and UT's interest in obtaining a critical mass.

Does critical mass depend on the relative size of a particular group in the population of a State? For example, is the critical mass of African-Americans and Hispanics in Texas, where African-Americans are about 11.8% of the population and Hispanics are about 37.6%, different from the critical mass in neighboring New Mexico, where the African-American population is much smaller (about 2.1%) and the Hispanic population constitutes a higher percentage of the State's total (about 46.3%)? See United States Census Bureau, QuickFacts, online at https://www.census.gov/quickfacts/table/PST045215/35,48 (all Internet materials as last visited June 21, 2016).

UT's answer to this question has veered back and forth. At oral argument in *Fisher I*, UT's lawyer indicated that critical mass "could" vary "from group to group" and from "state to state." See Tr. of Oral Arg. 40 (Oct. 10, 2012). And UT initially justified its race-conscious plan at least in part on the ground that "significant differences between

the racial and ethnic makeup of the University's under-
graduate population and the state's population prevent
the University from fully achieving its mission."  Supp.
App. 24a; see also *id.,* at 16a ("[A] critical mass in Texas is
necessarily larger than a critical mass in Michigan," be-
cause "[a] majority of the college-age population in Texas
is African American or Hispanic"); *Fisher*, 631 F. 3d, at
225–226, 236 (concluding that UT's reliance on Texas
demographics reflects "measured attention to the commu-
nity it serves"); Brief for Respondents in No. 11–345, at 41
(noting that critical mass may hinge, in part, on "the
communities that universities serve").  UT's extensive
reliance on state demographics is also revealed by its
substantial focus on increasing the representation of
Hispanics, but not Asian-Americans, see, *e.g.,* 645 F. Supp.
2d, at 606; Supp. App. 25a; App. 445a–446a, because
Hispanics, but not Asian-Americans, are underrepre-
sented at UT when compared to the demographics of the
State.[2]

On the other hand, UT's counsel asserted that the criti-
cal mass for the University is "not at all" dependent on the
demographics of Texas, and that UT's "concept [of] critical
mass isn't tied to demographic[s]."  Tr. of Oral Arg. 40, 49
(Oct. 10, 2012).  And UT's *Fisher I* brief expressly agreed
that "a university cannot look to racial demographics—
and then work backward in its admissions process to meet
a target tied to such demographics."  Brief for Respond-
ents in No. 11–345, at 31; see also Brief for Respondents

_____

[2] In 2010, 3.8% of Texas's population was Asian, but 18.6% of
UT's enrolled, first-time freshmen in 2008 were Asian-American.  See
Supp. App. 156a; United States Census Bureau, QuickFacts (Quick-
Facts Texas), online at https://www.census.gov/quickfacts/table/
PST045215/48.  By contrast, 37.6% of Texas's 2010 population identi-
fied as Hispanic or Latino, but a lower percentage—19.9%—of UT's
enrolled, first-time freshmen in 2008 were Hispanic.  See Supp. App.
156a; QuickFacts Texas.

26–27 (disclaiming any interest in demographic parity).

To the extent that UT is pursuing parity with Texas demographics, that is nothing more than "outright racial balancing," which this Court has time and again held "patently unconstitutional." *Fisher I*, 570 U. S., at ___ (slip op., at 9); see *Grutter*, 539 U. S., at 330 ("[O]utright racial balancing . . . is patently unconstitutional"); *Freeman* v. *Pitts*, 503 U. S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake"); *Croson*, 488 U. S., at 507 (rejecting goal of "outright racial balancing"); *Bakke*, 438 U. S., at 307 (opinion of Powell, J.) ("If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected . . . as facially invalid"). An interest "linked to nothing other than proportional representation of various races . . . would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the [program] continues to reflect that mixture." *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 614 (1990) (O'Connor, J., dissenting). And as we held in *Fisher I*, "'[r]acial balancing is not transformed from "patently unconstitutional" to a compelling state interest simply by relabeling it "racial diversity."'" 570 U. S., at ___ (slip op., at 9) (quoting *Parents Involved*, 551 U. S., at 732).

The record here demonstrates the pitfalls inherent in racial balancing. Although UT claims an interest in the educational benefits of diversity, it appears to have paid little attention to anything other than the number of minority students on its campus and in its classrooms. UT's 2004 Proposal illustrates this approach by repeatedly citing numerical assessments of the racial makeup of the student body and various classes as the justification for adopting a race-conscious plan. See, *e.g.,* Supp. App. 24a–26a, 30a. Instead of focusing on the benefits of diversity,

UT seems to have resorted to a simple racial census.

The majority, for its part, claims that "[a]lthough demographics alone are by no means dispositive, they do have some value as a gauge of the University's ability to enroll students who can offer underrepresented perspectives." *Ante,* at 14. But even if UT merely "view[s] the demographic disparity as cause for concern," Brief for United States as *Amicus Curiae* 29, and is seeking only to reduce—rather than eliminate—the disparity, that undefined goal cannot be properly subjected to strict scrutiny. In that case, there is simply no way for a court to know what specific demographic interest UT is pursuing, why a race-neutral alternative could not achieve that interest, and when that demographic goal would be satisfied. If a demographic discrepancy can serve as "a gauge" that justifies the use of racial discrimination, *ante*, at 14, then racial discrimination can be justified on that basis until demographic parity is reached. There is no logical stopping point short of patently unconstitutional racial balancing. Demographic disparities thus cannot be used to satisfy strict scrutiny here. See *Croson*, *supra*, at 498 (rejecting a municipality's assertion that its racial set-aside program was justified in light of past discrimination because that assertion had "'no logical stopping point'" and could continue until the percentage of government contracts awarded to minorities "mirrored the percentage of minorities in the population as a whole"); *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 275 (1986) (plurality opinion) (rejecting the government's asserted interest because it had "no logical stopping point").

2

The other major explanation UT offered in the Proposal was its desire to promote classroom diversity. The Proposal stressed that UT "has not reached a critical mass at the *classroom level*." Supp. App. 24a (emphasis added);

see also *id.*, at 1a, 25a, 39a; App. 316a. In support of this proposition, UT relied on a study of select classes containing five or more students. As noted above, the study indicated that 52% of these classes had no African-Americans, 16% had no Asian-Americans, and 12% had no Hispanics. Supp. App. 26a. The study further suggested that only 21% of these classes had two or more African-Americans, 67% had two or more Asian-Americans, and 70% had two or more Hispanics. See *ibid.* Based on this study, UT concluded that it had a "compelling educational interest" in employing racial preferences to ensure that it did not "have large numbers of classes in which there are no students—or only a single student—of a given underrepresented race or ethnicity." *Id.,* at 25a.

UT now equivocates, disclaiming any discrete interest in classroom diversity. See Brief for Respondents 26–27. Instead, UT has taken the position that the lack of classroom diversity was merely a "red flag that UT had not yet fully realized" "the constitutionally permissible educational benefits of diversity." Brief for Respondents in No. 11–345, at 43. But UT has failed to identify the level of classroom diversity it deems sufficient, again making it impossible to apply strict scrutiny.[3] A reviewing court cannot determine whether UT's race-conscious program was necessary to remove the so-called "red flag" without understanding the precise nature of that goal or knowing when the "red flag" will be considered to have disappeared.

Putting aside UT's effective abandonment of its interest in classroom diversity, the evidence cited in support of that interest is woefully insufficient to show that UT's

_____

[3] If UT's goal is to have at least two African-Americans, two Hispanics, and two Asian-Americans present in each of the relevant classrooms, that goal is literally unreachable in classes of five and practically unreachable in many other small classes.

race-conscious plan was necessary to achieve the educational benefits of a diverse student body. As far as the record shows, UT failed to even scratch the surface of the available data before reflexively resorting to racial preferences. For instance, because UT knows which students were admitted through the Top Ten Percent Plan and which were not, as well as which students enrolled in which classes, it would seem relatively easy to determine whether Top Ten Percent students were more or less likely than holistic admittees to enroll in the types of classes where diversity was lacking. But UT never bothered to figure this out. See *ante*, at 9 (acknowledging that UT submitted no evidence regarding "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review"). Nor is there any indication that UT instructed admissions officers to search for African-American and Hispanic applicants who would fill particular gaps at the classroom level. Given UT's failure to present such evidence, it has not demonstrated that its race-conscious policy would promote classroom diversity any better than race-neutral options, such as expanding the Top Ten Percent Plan or using race-neutral holistic admissions.

Moreover, if UT is truly seeking to expose its students to a diversity of ideas and perspectives, its policy is poorly tailored to serve that end. UT's own study—which the majority touts as the best "nuanced quantitative data" supporting UT's position, *ante*, at 15—demonstrated that classroom diversity was more lacking for students classified as Asian-American than for those classified as Hispanic. Supp. App. 26a. But the UT plan discriminates *against* Asian-American students.[4] UT is apparently

_____

[4] The majority's assertion that UT's race-based policy does not discriminate against Asian-American students, see *ante,* at 5–6, defies the laws of mathematics. UT's program is clearly designed to increase the

unconcerned that Asian-Americans "may be made to feel isolated or may be seen as . . . 'spokesperson[s]' of their race or ethnicity." *Id.,* at 69a; see *id.*, at 25a. And unless the University is engaged in unconstitutional racial balancing based on Texas demographics (where Hispanics outnumber Asian-Americans), see Part II–C–1, *supra*, it seemingly views the classroom contributions of Asian-American students as less valuable than those of Hispanic students. In UT's view, apparently, "Asian Americans are not worth as much as Hispanics in promoting 'cross-racial understanding,' breaking down 'racial stereotypes,' and enabling students to 'better understand persons of different races.'" Brief for Asian American Legal Foundation et al. as *Amici Curiae* 11 (representing 117 Asian-American organizations). The majority opinion effectively endorses this view, crediting UT's reliance on the classroom study as proof that the University assessed its need for racial discrimination (including racial discrimination that undeniably harms Asian-Americans) "with care." *Ante*, at 15.

While both the majority and the Fifth Circuit rely on UT's classroom study, see *ante*, at 15; 758 F. 3d, at 658–659, they completely ignore its finding that Hispanics are better represented than Asian-Americans in UT classrooms. In fact, they act almost as if Asian-American students do not exist. See *ante*, at 14 (mentioning Asian-Americans only a single time outside of parentheticals, and not in the context of the classroom study); 758 F. 3d,

---

number of African-American and Hispanic students by giving them an admissions boost vis-à-vis other applicants. See, *e.g.,* Supp. App. 25a; App. 445a–446a; cf. 645 F. Supp. 2d 587, 606 (WD Tex. 2009); see also *ante,* at 15 (citing increases in the presence of African-Americans and Hispanics at UT as evidence that its race-based program was successful). Given a "limited number of spaces," App. 250a, providing a boost to African-Americans and Hispanics inevitably harms students who do not receive the same boost by decreasing their odds of admission.

at 658 (mentioning Asian-Americans only a single time).[5] Only the District Court acknowledged the impact of UT's policy on Asian-American students. But it brushed aside this impact, concluding—astoundingly—that UT can pick and choose which racial and ethnic groups it would like to favor. According to the District Court, "nothing in *Grutter* requires a university to give equal preference to every minority group," and UT is allowed "to exercise its discretion in determining which minority groups should benefit from the consideration of race." 645 F. Supp. 2d, at 606.

This reasoning, which the majority implicitly accepts by blessing UT's reliance on the classroom study, places the Court on the "tortuous" path of "decid[ing] which races to

_____

[5] In particular, the Fifth Circuit's willful blindness to Asian-American students is absolutely shameless. For instance, one of the Fifth Circuit's primary contentions—which UT repeatedly highlighted in its brief and at argument—is that, given the SAT score gaps between whites on the one hand and African-Americans and Hispanics on the other, "holistic admissions would approach an all-white enterprise" in the absence of racial preferences. 758 F. 3d, at 647. In making this argument, the court below failed to mention Asian-Americans. The reason for this omission is obvious: As indicated in *the very sources* that the Fifth Circuit relied on for this point, on *the very pages* it cited, Asian-American enrollees admitted to UT through holistic review have consistently *higher* average SAT scores than white enrollees admitted through holistic review. See UT, Office of Admissions, Implementation and Results of the Texas Automatic Admissions Law (HB 588) at the University of Texas at Austin, Demographic Analysis of Entering Freshmen Fall of 2006, pp. 11–14 (rev. Dec. 6, 2007), cited at 758 F. 3d, at 647, n. 71; UT, Office of Admissions, Implementation and Results of the Texas Automatic Admissions Law (HB 588) at the University of Texas at Austin, Demographic Analysis of Entering Freshmen Fall of 2008, pp. 12–15 (Oct. 28, 2008), cited at 758 F. 3d, at 647, n. 72. The Fifth Circuit's intentional omission of Asian-Americans from its analysis is also evident in the appendices to its opinion, which either omit any reference to Asian-Americans or misleadingly label them as "other." See *id.,* at 661. The reality of how UT treats Asian-American applicants apparently does not fit into the neat story the Fifth Circuit wanted to tell.

favor." *Metro Broadcasting*, 497 U. S., at 632 (KENNEDY, J., dissenting). And the Court's willingness to allow this "discrimination against individuals of Asian descent in UT admissions is particularly troubling, in light of the long history of discrimination against Asian Americans, especially in education." Brief for Asian American Legal Foundation et al. as *Amici Curiae* 6; see also, *e.g., id.,* at 16–17 (discussing the placement of Chinese-Americans in "'separate but equal'" public schools); *Gong Lum* v. *Rice*, 275 U. S. 78, 81–82 (1927) (holding that a 9-year-old Chinese-American girl could be denied entry to a "white" school because she was "a member of the Mongolian or yellow race"). In sum, "[w]hile the Court repeatedly refers to the preferences as favoring 'minorities,' . . . it must be emphasized that the discriminatory policies upheld today operate to exclude" Asian-American students, who "have not made [UT's] list" of favored groups. *Metro Broadcasting*, *supra*, at 632 (KENNEDY, J., dissenting).

Perhaps the majority finds discrimination against Asian-American students benign, since Asian-Americans are "*overrepresented*" at UT. 645 F. Supp. 2d, at 606. But "[h]istory should teach greater humility." *Metro Broadcasting*, 497 U. S., at 609 (O'Connor, J., dissenting). "'[B]enign' carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable." *Id.,* at 610. Where, as here, the government has provided little explanation for why it needs to discriminate based on race, "'there is simply no way of determining what classifications are "benign" . . . and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Parents Involved*, 551 U. S., at 783 (opinion of KENNEDY, J.) (quoting *Croson*, 488 U. S., at 493 (plurality opinion of O'Connor, J.)). By accepting the classroom study as proof that UT satisfied strict scrutiny,

the majority "move[s] us from 'separate but equal' to 'un-equal but benign.'" *Metro Broadcasting*, *supra*, at 638 (KENNEDY, J., dissenting).

In addition to demonstrating that UT discriminates against Asian-American students, the classroom study also exhibits UT's use of a few crude, overly simplistic racial and ethnic categories. Under the UT plan, both the favored and the disfavored groups are broad and consist of students from enormously diverse backgrounds. See Supp. App. 30a; see also *Fisher I*, 570 U. S., at ___ (slip op., at 4) ("five predefined racial categories"). Because "[c]rude measures of this sort threaten to reduce [students] to racial chits," *Parents Involved*, 551 U. S., at 798 (opinion of KENNEDY, J.), UT's reliance on such measures further undermines any claim based on classroom diversity statistics, see *id.,* at 723 (majority opinion) (criticizing school policies that viewed race in rough "white/nonwhite" or "black/'other'" terms); *id.*, at 786 (opinion of KENNEDY, J.) (faulting government for relying on "crude racial categories"); *Metro Broadcasting*, *supra*, at 633, n. 1 (KENNEDY, J., dissenting) (concluding that "'the very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals,'" and noting that if the government "'is to make a serious effort to define racial classes by criteria that can be administered objectively, it must study precedents such as the First Regulation to the Reichs Citizenship Law of November 14, 1935'").

For example, students labeled "Asian American," Supp. App. 26a, seemingly include "individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, Indian and other backgrounds comprising roughly 60% of the world's population," Brief for Asian American Legal Foundation et al. as *Amici Curiae*, O. T. 2012, No. 11–345,

p. 28.[6]  It would be ludicrous to suggest that all of these students have similar backgrounds and similar ideas and experiences to share.  So why has UT lumped them together and concluded that it is appropriate to discriminate against Asian-American students because they are "overrepresented" in the UT student body?  UT has no good answer.  And UT makes no effort to ensure that it has a critical mass of, say, "Filipino Americans" or "Cambodian Americans."  Tr. of Oral Arg. 52 (Oct. 10, 2012).  As long as there are a sufficient number of "Asian Americans," UT is apparently satisfied.

UT's failure to provide any definition of the various racial and ethnic groups is also revealing.  UT does not specify what it means to be "African-American," "Hispanic," "Asian American," "Native American," or "White."  Supp. App. 30a.  And UT evidently labels each student as falling into only a single racial or ethnic group, see, *e.g., id.,* at 10a–13a, 30a, 43a–44a, 71a, 156a–157a, 169a–170a, without explaining how individuals with ancestors from different groups are to be characterized.  As racial and ethnic prejudice recedes, more and more students will have parents (or grandparents) who fall into more than one of UT's five groups.  According to census figures, individuals describing themselves as members of multiple races grew by 32% from 2000 to 2010.[7]  A recent survey reported that 26% of Hispanics and 28% of Asian-Americans marry a spouse of a different race or ethnicity.[8]

———————

[6] And it is anybody's guess whether this group also includes applicants "of full or partial Arab, Armenian, Azerbaijani, Georgian, Kurdish, Persian, or Turkish descent, or whether such applicants are to be considered 'White.'"  Brief for Judicial Watch, Inc., et al. as *Amici Curiae* 16.

[7] United States Census Bureau, 2010 Census Shows Multiple-Race Population Grew Faster Than Single-Race Population (Sept. 27, 2012), online at https://www.census.gov/newsroom/releases/archives/race/cb12-182.html.

[8] W. Wang, Pew Research Center, Interracial Marriage: Who Is

UT's crude classification system is ill suited for the more integrated country that we are rapidly becoming. UT assumes that if an applicant describes himself or herself as a member of a particular race or ethnicity, that applicant will have a perspective that differs from that of applicants who describe themselves as members of different groups. But is this necessarily so? If an applicant has one grandparent, great-grandparent, or great-great-grandparent who was a member of a favored group, is that enough to permit UT to infer that this student's classroom contribution will reflect a distinctive perspective or set of experiences associated with that group? UT does not say. It instead relies on applicants to "classify themselves." *Fisher I*, 570 U. S., at ___ (slip op., at 4). This is an invitation for applicants to game the system.

Finally, it seems clear that the lack of classroom diversity is attributable in good part to factors other than the representation of the favored groups in the UT student population. UT offers an enormous number of classes in a wide range of subjects, and it gives undergraduates a very large measure of freedom to choose their classes. UT also offers courses in subjects that are likely to have special appeal to members of the minority groups given preferential treatment under its challenged plan, and this of course diminishes the number of other courses in which these students can enroll. See, *e.g.,* Supp. App. 72a–73a (indicating that the representation of African-Americans and Hispanics in UT classrooms varies substantially from major to major). Having designed an undergraduate program that virtually ensures a lack of classroom diversity, UT is poorly positioned to argue that this very result

——————

"Marrying Out"? (June 12, 2015), online at http://www.pewresearch.org/fact-tank/2015/06/12/interracial-marriage-who-is-marrying-out/; W. Wang, Pew Research Center, The Rise of Intermarriage (Feb. 16, 2012), online at http://www.pewsocialtrends.org/2012/02/16/the-rise-of-intermarriage/.

provides a justification for racial and ethnic discrimination, which the Constitution rarely allows.

### 3

UT's purported interest in intraracial diversity, or "diversity within diversity," Brief for Respondents 34, also falls short. At bottom, this argument relies on the unsupported assumption that there is something deficient or at least radically different about the African-American and Hispanic students admitted through the Top Ten Percent Plan.

Throughout this litigation, UT has repeatedly shifted its position on the need for intraracial diversity. Initially, in the 2004 Proposal, UT did not rely on this alleged need at all. Rather, the Proposal "examined two metrics—classroom diversity and demographic disparities—that it concluded were relevant to its ability to provide [the] benefits of diversity." Brief for United States as *Amicus Curiae* 27–28. Those metrics looked only to the numbers of African-Americans and Hispanics, not to diversity within each group.

On appeal to the Fifth Circuit and in *Fisher I*, however, UT began to emphasize its intraracial diversity argument. UT complained that the Top Ten Percent Law hinders its efforts to assemble a broadly diverse class because the minorities admitted under that law are drawn largely from certain areas of Texas where there are majority-minority schools. These students, UT argued, tend to come from poor, disadvantaged families, and the University would prefer a system that gives it substantial leeway to seek broad diversity *within* groups of underrepresented minorities. In particular, UT asserted a need for more African-American and Hispanic students from privileged backgrounds. See, *e.g.,* Brief for Respondents in No. 11–345, at 34 (explaining that UT needs race-conscious admissions in order to admit "[t]he African-American or

Hispanic child of successful professionals in Dallas"); *ibid.* (claiming that privileged minorities "have great potential for serving as a 'bridge' in promoting cross-racial understanding, as well as in breaking down racial stereotypes"); *ibid.* (intimating that the underprivileged minority students admitted under the Top Ten Percent Plan "*reinforc[e]*" "stereotypical assumptions"); Tr. of Oral Arg. 43–45 (Oct. 10, 2012) ("[A]lthough the percentage plan certainly helps with minority admissions, by and large, the—the minorities who are admitted tend to come from segregated, racially-identifiable schools," and "we want minorities from different backgrounds"). Thus, the Top Ten Percent Law is faulted for admitting *the wrong kind of African-American and Hispanic students.*

The Fifth Circuit embraced this argument on remand, endorsing UT's claimed need to enroll minorities from "high-performing," "majority-white" high schools. 758 F. 3d, at 653. According to the Fifth Circuit, these more privileged minorities "bring a perspective not captured by" students admitted under the Top Ten Percent Law, who often come "from highly segregated, underfunded, and underperforming schools." *Ibid.* For instance, the court determined, privileged minorities "can enrich the diversity of the student body in distinct ways" because such students have "higher levels of preparation and better prospects for admission to UT Austin's more demanding colleges" than underprivileged minorities. *Id.,* at 654; see also *Fisher*, 631 F. 3d, at 240, n. 149 (concluding that the Top Ten Percent Plan "widens the 'credentials gap' between minority and non-minority students at the University, which risks driving away matriculating minority students from difficult majors like business or the sciences").

Remarkably, UT now contends that petitioner has "fabricat[ed]" the argument that it is seeking affluent minorities. Brief for Respondents 2. That claim is impossible to

square with UT's prior statements to this Court in the briefing and oral argument in *Fisher I*.[9]  Moreover, although UT reframes its argument, it continues to assert that it needs affirmative action to admit privileged minorities.  For instance, UT's brief highlights its interest in admitting "[t]he black student with high grades from Andover."  Brief for Respondents 33.  Similarly, at oral argument, UT claimed that its "interests in the educational benefits of diversity would not be met if all of [the] minority students were . . . coming from depressed socioeconomic backgrounds."  Tr. of Oral Arg. 53 (Dec. 9, 2015); see also *id.,* at 43, 45.

Ultimately, UT's intraracial diversity rationale relies on the baseless assumption that there is something wrong with African-American and Hispanic students admitted through the Top Ten Percent Plan, because they are "from the lower-performing, racially identifiable schools."  *Id.,* at 43; see *id.,* at 42–43 (explaining that "the basis" for UT's

_____

[9]*Amici* supporting UT certainly understood it to be arguing that it needs affirmative action to admit privileged minorities.  See Brief for Six Educational Nonprofit Organizations 38 (citing Brief for Respondents in No. 11–345, p. 34).  And UT's *amici* continue to press the full-throated version of the argument.  See Brief for Six Educational Nonprofit Organizations 12–13 ("Intraracial diversity . . . explodes perceived associations between racial groups and particular demographic characteristics, such as the 'common stereotype of Black and Latina/o students[ ] that all students from these groups come from poor, inner-city backgrounds.'  Schools like UT combat such stereotypes by seeking to admit African-American and Latino students from elevated socioeconomic and/or non-urban backgrounds" (citation omitted)); *id.,* at 15 (arguing that UT needs racial preferences to admit minority students from "elevated" "socioeconomic backgrounds," because "such students are on a more equal social footing with the average nonminority student"); *id.,* at 37–38 ("African-American and Latino students who may come from higher socioeconomic status . . . may serve as 'debiasing agent[s],' promoting disequilibrium to disrupt stereotypical associations.  These students are also likely to be better able to promote communication and integration on campus" (citation omitted)).

conclusion that it was "not getting a variety of perspectives among African-Americans or Hispanics" was the fact that the Top Ten Percent Plan admits underprivileged minorities from highly segregated schools). In effect, UT asks the Court "to *assume*"—without any evidence—"that minorities admitted under the Top Ten Percent Law . . . are somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review." 758 F. 3d, at 669–670 (Garza, J., dissenting). And UT's assumptions appear to be based on the pernicious stereotype that the African-Americans and Hispanics admitted through the Top Ten Percent Plan only got in because they did not have to compete against very many whites and Asian-Americans. See Tr. of Oral Arg. 42–43 (Dec. 9, 2015). These are "the very stereotypical assumptions [that] the Equal Protection Clause forbids." *Miller*, 515 U. S., at 914. UT cannot satisfy its burden by attempting to "substitute racial stereotype for evidence, and racial prejudice for reason." *Calhoun* v. *United States*, 568 U. S. ___, ___ (2013) (slip op., at 4) (SOTOMAYOR, J., respecting denial of certiorari).

In addition to relying on stereotypes, UT's argument that it needs racial preferences to admit privileged minorities turns the concept of affirmative action on its head. When affirmative action programs were first adopted, it was for the purpose of helping the disadvantaged. See, *e.g., Bakke*, 438 U. S., at 272–275 (opinion of Powell, J.) (explaining that the school's affirmative action program was designed "to increase the representation" of "'economically and/or educationally disadvantaged' applicants"). Now we are told that a program that tends to admit poor and disadvantaged minority students is inadequate because it does not work to the advantage of those who are more fortunate. This is affirmative action gone wild.

It is also far from clear that UT's assumptions about the socioeconomic status of minorities admitted

through the Top Ten Percent Plan are even remotely accurate. Take, for example, parental education. In 2008, when petitioner applied to UT, approximately 79% of Texans aged 25 years or older had a high school diploma, 17% had a bachelor's degree, and 8% had a graduate or professional degree. Dept. of Educ., Nat. Center for Educ. Statistics, T. Snyder & S. Dillow, Digest of Education Statistics 2010, p. 29 (2011). In contrast, 96% of African-Americans admitted through the Top Ten Percent Plan had a parent with a high school diploma, 59% had a parent with a bachelor's degree, and 26% had a parent with a graduate or professional degree. See UT, Office of Admissions, Student Profile, Admitted Freshman Class of 2008, p. 8 (rev. Aug. 1, 2012) (2008 Student Profile), online at https:// uteas.app.box.com/s/twqozsbm2vb9lhm14o0v0czvqs1ygzqr/ 1/7732448553/23476747441/1. Similarly, 83% of Hispanics admitted through the Top Ten Percent Plan had a parent with a high school diploma, 42% had a parent with a bachelor's degree, and 21% had a parent with a graduate or professional degree. *Ibid.* As these statistics make plain, the minorities that UT characterizes as "coming from depressed socioeconomic backgrounds," Tr. of Oral Arg. 53 (Dec. 9, 2015), generally come from households with education levels exceeding the norm in Texas.

Or consider income levels. In 2008, the median annual household income in Texas was $49,453. United States Census Bureau, A. Noss, Household Income for States: 2008 and 2009, p. 4 (2010), online at https://www.census.gov/prod/2010pubs/acsbr09-2.pdf. The household income levels for Top Ten Percent African-American and Hispanic admittees were on par: Roughly half of such admittees came from households below the Texas median, and half came from households above the median. See 2008 Student Profile 6. And a large portion of these admittees are from households with income levels

far exceeding the Texas median. Specifically, 25% of African-Americans and 27% of Hispanics admitted through the Top Ten Percent Plan in 2008 were raised in households with incomes exceeding $80,000. *Ibid.* In light of this evidence, UT's actual argument is not that it needs affirmative action to ensure that its minority admittees are representative of the State of Texas. Rather, UT is asserting that it needs affirmative action to ensure that its minority students disproportionally come from families that are wealthier and better educated than the average Texas family.

In addition to using socioeconomic status to falsely denigrate the minority students admitted through the Top Ten Percent Plan, UT also argues that such students are academically inferior. See, *e.g.,* Brief for Respondents in No. 11–345, at 33 ("[T]he top 10% law systematically hinders UT's efforts to assemble a class that is . . . academically excellent"). "On average," UT claims, "African-American and Hispanic holistic admits have higher SAT scores than their Top 10% counterparts." Brief for Respondents 43, n. 8. As a result, UT argues that it needs race-conscious admissions to enroll academically superior minority students with higher SAT scores. Regrettably, the majority seems to embrace this argument as well. See *ante,* at 16 ("[T]he Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence").

This argument fails for a number of reasons. First, it is simply not true that Top Ten Percent minority admittees are academically inferior to holistic admittees. In fact, as UT's president explained in 2000, "top 10 percent high school students make much higher grades in college than non-top 10 percent students," and "[s]trong academic performance in high school is an even better predictor of success in college than standardized test scores." App. 393a–394a; see also Lavergne Deposition 41–42 (agreeing

that "it's generally true that students admitted pursuant to HB 588 [the Top Ten Percent Law] have a higher level of academic performance at the University than students admitted outside of HB 588"). Indeed, the statistics in the record reveal that, for each year between 2003 and 2007, African-American in-state freshmen who were admitted under the Top Ten Percent Law earned a higher mean grade point average than those admitted outside of the Top Ten Percent Law. Supp. App. 164a. The same is true for Hispanic students. *Id.,* at 165a. These conclusions correspond to the results of nationwide studies showing that high school grades are a better predictor of success in college than SAT scores.[10]

It is also more than a little ironic that UT uses the SAT, which has often been accused of reflecting racial and cultural bias,[11] as a reason for dissatisfaction with poor

—————

[10] See, *e.g.,* Strauss, Study: High School Grades Best Predictor of College Success—Not SAT/ACT Scores, Washington Post*,* Feb. 21, 2014, online at https://www.washingtonpost.com/news/answer-sheet/wp/2014/02/21/a-telling-study-about-act-sat-scores/.

[11] See, *e.g.,* Freedle, Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores, 73 Harv. Ed. Rev. 1 (2003) ("The SAT has been shown to be both culturally and statistically biased against African Americans, Hispanic Americans, and Asian Americans"); Santelices & Wilson, Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning, 80 Harv. Ed. Rev. 106, 127 (2010) (questioning the validity of African-American SAT scores and, consequently, admissions decisions based on those scores); Brief for Amherst University et al. as *Amici Curiae* 15–16 ("[E]xperience has taught *amici* that SAT and ACT scores for African-American students do not accurately predict achievement later in college and beyond"); Brief for Experimental Psychologists as *Amici Curiae* 7 ("A substantial body of research by social scientists has revealed that standardized test scores and grades often underestimate the true academic capacity of members of certain minority groups"); Brief for Six Educational Nonprofit Organizations as *Amici Curiae* 21 ("Underrepresentation of African-American and Latino students by conventional academic metrics was also a reflection of the racial bias in standardized testing").

and disadvantaged African-American and Hispanic students who excel both in high school and in college. Even if the SAT does not reflect such bias (and I am ill equipped to express a view on that subject), SAT scores clearly correlate with wealth.[12]

UT certainly has a compelling interest in admitting students who will achieve academic success, but it does not follow that it has a compelling interest in maximizing admittees' SAT scores. Approximately 850 4-year-degree institutions do not require the SAT or ACT as part of the admissions process. See J. Soares, SAT Wars: The Case for Test-Optional College Admissions 2 (2012). This includes many excellent schools.[13]

––––––––––

[12] Zumbrun, SAT Scores and Income Inequality: How Wealthier Kids Rank Higher, Wall Street Journal, Oct. 7, 2014, online at http://blogs.wsj.com/economics/2014/10/07/sat-scores-and-income-inequality-how-wealthier-kids-rank-higher/.

[13] See *e.g.,* Brief for California Institute of Technology et al. as *Amici Curiae* 15 ("[I]n amicus George Washington University's experience, standardized test scores are considered so limited in what they can reveal about an applicant that the University recently has done away with the requirement altogether"); see also American University, Applying Test Optional, online at http://www.american.edu/admissions/testoptional.cfm; The University of Arizona, Office of Admissions, Frequently Asked Questions, online at https://admissions.arizona.edu/freshmen/frequently-asked-questions; Bowdoin College, Test Optional Policy, online at http://www.bowdoin.edu/admissions/apply/testing-policy.shtml; Brandeis University, Test-Optional Policy, online at http://www.brandeis.edu/admissions/apply/testing.html; Bryn Mawr College, Standardized Testing Policy, online at http://www.brynmawr.edu/admissions/standardized-testing-policy; College of the Holy Cross, What We Look For, online at http://www.holycross.edu/admissions-aid/what-we-look-for; George Washington University, Test-Optional Policy, online at https://undergraduate.admissions.gwu.edu/test-optional-policy; New York University, Standardized Tests, online at http://www.nyu.edu/admissions/undergraduate-admissions/how-to-apply/all-freshmen-applicants/instructions/standardized-tests.html; Smith College, For First-Year Students, online at http://www.smith.edu/admission/firstyear_apply.php; Temple University, Temple Option FAQ, online at http://admissions.temple.edu/node/441; Wake Forest

To the extent that intraracial diversity refers to something other than admitting privileged minorities and minorities with higher SAT scores, UT has failed to define that interest with any clarity. UT "has not provided any concrete targets for admitting more minority students possessing [the] unique qualitative-diversity characteristics" it desires. 758 F. 3d, at 669 (Garza, J., dissenting). Nor has UT specified which characteristics, viewpoints, and life experiences are supposedly lacking in the African-Americans and Hispanics admitted through the Top Ten Percent Plan. In fact, because UT administrators make no collective, qualitative assessment of the minorities admitted automatically, they have no way of knowing which attributes are missing. See *ante,* at 9 (admitting that there is no way of knowing "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review"); 758 F. 3d, at 669 (Garza, J., dissenting) ("The University

—————

University, Test Optional, online at http://admissions.wfu.edu/apply/test-optional/.

In 2008, Wake Forest dropped standardized testing requirements based at least in part on "the perception that these tests are unfair to blacks and other minorities and do not offer an effective tool to determine if these minority students will succeed in college." Wake Forest Presents the Most Serious Threat So Far to the Future of the SAT, The Journal of Blacks in Higher Education, No. 60 (Summer 2008), p. 9; see also *ibid.* ("University admissions officials say that one reason for dropping the SAT is to encourage more black and minority applicants"). "The year after the new policy was announced, Wake Forest's minority applications went up by 70%, and the first test-optional class" exhibited "a big leap forward" in minority enrollment. J. Soares, SAT Wars: The Case for Test-Optional College Admissions 3 (2012). From 2008 to 2015, "[e]thnic diversity in the undergraduate population increased by 54 percent." Wake Forest University, Test Optional, online at http://admissions.wfu.edu/apply/test-optional/. And Wake Forest reports that dropping standardized testing requirements has "not compromise[d] the academic quality of [the] institution," and that it has made the university "more diverse and intellectually stimulating." *Ibid.*

does not assess whether Top Ten Percent Law admittees exhibit sufficient diversity within diversity, whether the requisite 'change agents' are among them, and whether these admittees are able, collectively or individually, to combat pernicious stereotypes"). Furthermore, UT has not identified "when, if ever, its goal (which remains unde-fined) for qualitative diversity will be reached." *Id.,* at 671. UT's intraracial diversity rationale is thus too impre-cise to permit strict scrutiny analysis.

Finally, UT's shifting positions on intraracial diversity, and the fact that intraracial diversity was not emphasized in the Proposal, suggest that it was not "the actual pur-pose underlying the discriminatory classification." *Missis-sippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 730 (1982). Instead, it appears to be a *post hoc* rationalization.

4

UT also alleges—and the majority embraces—an inter-est in avoiding "feelings of loneliness and isolation" among minority students. *Ante*, at 14–15; see Brief for Respond-ents 7–8, 38–39. In support of this argument, they cite only demographic data and anecdotal statements by UT officials that some students (we are not told how many) feel "isolated." This vague interest cannot possibly satisfy strict scrutiny.

If UT is seeking demographic parity to avoid isolation, that is impermissible racial balancing. See Part II–C–1, *supra*. And linking racial loneliness and isolation to state demographics is illogical. Imagine, for example, that an African-American student attends a university that is 20% African-American. If racial isolation depends on a com-parison to state demographics, then that student is more likely to feel isolated if the school is located in Mississippi (which is 37.0% African-American) than if it is located in Montana (which is 0.4% African-American). See United States Census Bureau, QuickFacts, online at https://

www.census.gov/quickfacts/table/PST045215/28,30.    In
reality, however, the student may feel—if anything—*less*
isolated in Mississippi, where African-Americans are more
prevalent in the population at large.

If, on the other hand, state demographics are not driv-
ing UT's interest in avoiding racial isolation, then its
treatment of Asian-American students is hard to under-
stand. As the District Court noted, "the gross number of
Hispanic students attending UT exceeds the gross number
of Asian-American students." 645 F. Supp. 2d, at 606. In
2008, for example, UT enrolled 1,338 Hispanic freshmen
and 1,249 Asian-American freshmen. Supp. App. 156a.
UT never explains why the Hispanic students—but not
the Asian-American students—are isolated and lonely
enough to receive an admissions boost, notwithstanding
the fact that there are more Hispanics than Asian-
Americans in the student population. The anecdotal
statements from UT officials certainly do not indicate that
Hispanics are somehow lonelier than Asian-Americans.

Ultimately, UT has failed to articulate its interest in
preventing racial isolation with any clarity, and it has
provided no clear indication of how it will know when such
isolation no longer exists. Like UT's purported interests
in demographic parity, classroom diversity, and intrara-
cial diversity, its interest in avoiding racial isolation can-
not justify the use of racial preferences.

D

Even assuming UT is correct that, under *Grutter*, it
need only cite a generic interest in the educational bene-
fits of diversity, its plan still fails strict scrutiny because it
is not narrowly tailored. Narrow tailoring requires "a
careful judicial inquiry into whether a university could
achieve sufficient diversity without using racial classifica-
tions." *Fisher I*, 570 U. S., at \_\_\_ (slip op., at 10). "If a
'"nonracial approach . . . could promote the substantial

interest about as well and at tolerable administrative expense,"' then the university may not consider race." *Id.,* at ___ (slip op., at 11) (citations omitted). Here, there is no evidence that race-blind, holistic review would not achieve UT's goals at least "about as well" as UT's race-based policy. In addition, UT could have adopted other approaches to further its goals, such as intensifying its outreach efforts, uncapping the Top Ten Percent Law, or placing greater weight on socioeconomic factors.

The majority argues that none of these alternatives is "a workable means for the University to attain the benefits of diversity it sought." *Ante*, at 16. Tellingly, however, the majority devotes only a single, conclusory sentence to the most obvious race-neutral alternative: race-blind, holistic review that considers the applicant's unique characteristics and personal circumstances. See *ibid.*[14] Under a system that combines the Top Ten Percent Plan with race-blind, holistic review, UT could still admit "the star athlete or musician whose grades suffered because of daily practices and training," the "talented young biologist who struggled to maintain above-average grades in humanities classes," and the "student whose freshman-year grades were poor because of a family crisis but who got herself back on track in her last three years of school." *Ante,* at

---

[14] The Court asserts that race-blind, holistic review is not a workable alternative because UT tried, and failed, to meet its goals via that method from 1996 to 2003. See *ante,* at 16 ("Perhaps more significantly, in the wake of *Hopwood*, the University spent seven years attempting to achieve its compelling interest using race-neutral holistic review"). But the Court never explains its basis for concluding that UT's previous system failed. We are not told how the Court is measuring success or how it knows that a race-conscious program will satisfy UT's goals more effectively than race-neutral, holistic review. And although the majority elsewhere emphasizes "the University's continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances," *ante,* at 10, its rejection of race-blind, holistic review relies exclusively on "evidence" predating petitioner's suit by five years.

17. All of these unique circumstances can be considered without injecting race into the process. Because UT has failed to provide any evidence whatsoever that race-conscious holistic review will achieve its diversity objectives more effectively than race-blind holistic review, it cannot satisfy the heavy burden imposed by the strict scrutiny standard.

The fact that UT's racial preferences are unnecessary to achieve its stated goals is further demonstrated by their minimal effect on UT's diversity. In 2004, when race was not a factor, 3.6% of non-Top Ten Percent Texas enrollees were African-American and 11.6% were Hispanic. See Supp. App. 157a. It would stand to reason that at least the same percentages of African-American and Hispanic students would have been admitted through holistic review in 2008 even if race were not a factor. If that assumption is correct, then race was determinative for only 15 African-American students and 18 Hispanic students in 2008 (representing 0.2% and 0.3%, respectively, of the total enrolled first-time freshmen from Texas high schools). See *ibid.*[15]

The majority contends that "[t]he fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring,

_____

[15] In 2008, 1,208 first-time freshmen from Texas high schools enrolled at UT after being admitted outside the Top Ten Percent Plan. Supp. App. 157a. Based on the 2004 statistics, it is reasonable to assume that, if the University had undertaken a *race-neutral* holistic review in 2008, 3.6% (43) of these students would have been African-American and 11.6% (140) would have been Hispanic. See *ibid.* Under the University's *race-conscious* holistic review, 58 African-American freshmen from Texas and 158 Hispanic freshmen from Texas were enrolled in 2008, thus reflecting an increase of only 15 African-American students and 18 Hispanic students. And if those marginal increases (of 15 and 18 students) are divided by the number of total enrolled first-time freshmen from Texas high schools (6,322), see *ibid.*, the calculation yields the 0.2% and 0.3% percentages mentioned in the text above.

not evidence of unconstitutionality." *Ante,* at 15. This argument directly contradicts this Court's precedent. Because racial classifications are "'a highly suspect tool,'" *Grutter,* 539 U. S, at 326, they should be employed only "as a last resort," *Croson,* 488 U. S., at 519 (opinion of KENNEDY, J.); see also *Grutter*, *supra*, at 342 ("[R]acial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands"). Where, as here, racial preferences have only a slight impact on minority enrollment, a race-neutral alternative likely could have reached the same result. See *Parents Involved*, 551 U. S., at 733–734 (holding that the "minimal effect" of school districts' racial classifications "casts doubt on the necessity of using [such] classifications" and "suggests that other means [of achieving their objectives] would be effective"). As JUSTICE KENNEDY once aptly put it, "the small number of [students] affected suggests that the schoo[l] could have achieved [its] stated ends through different means." *Id.,* at 790 (opinion concurring in part and concurring in judgment). And in this case, a race-neutral alternative could accomplish UT's objectives without gratuitously branding the covers of tens of thousands of applications with a bare racial stamp and "tell[ing] each student he or she is to be defined by race." *Id.,* at 789.

### III

The majority purports to agree with much of the above analysis. The Court acknowledges that "'because racial characteristics so seldom provide a relevant basis for disparate treatment,'" "'[r]ace may not be considered [by a university] unless the admissions process can withstand strict scrutiny.'" *Ante,* at 6–7. The Court admits that the burden of proof is on UT, *ante,* at 7, and that "a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a

race-conscious plan," *ante,* at 13–14. And the Court recog-
nizes that the record here is "almost devoid of information
about the students who secured admission to the Univer-
sity through the Plan," and that "[t]he Court thus cannot
know how students admitted solely based on their class
rank differ in their contribution to diversity from students
admitted through holistic review." *Ante,* at 9. This should
be the end of the case: Without identifying what was
missing from the African-American and Hispanic students
it was already admitting through its race-neutral process,
and without showing how the use of race-based admis-
sions could rectify the deficiency, UT cannot demonstrate
that its procedure is narrowly tailored.

  Yet, somehow, the majority concludes that *petitioner*
must lose as a result of UT's failure to provide evidence
justifying its decision to employ racial discrimination.
Tellingly, the Court frames its analysis as if petitioner
bears the burden of proof here. See *ante*, at 11–19. But it
is not the petitioner's burden to show that the considera-
tion of race is unconstitutional. To the extent the record is
inadequate, the responsibility lies with UT. For "[w]hen a
court subjects governmental action to strict scrutiny, it
cannot construe ambiguities in favor of the State," *Parents
Involved*, *supra*, at 786 (opinion of KENNEDY, J.), particu-
larly where, as here, the summary judgment posture
obligates the Court to view the facts in the light most
favorable to petitioner, see *Matsushita Elec. Industrial Co.*
v. *Zenith Radio Corp.*, 475 U. S. 574, 587 (1986).

  Given that the University bears the burden of proof, it is
not surprising that UT never made the argument that it
should win based on the *lack* of evidence. UT instead
asserts that "if the Court believes there are any deficien-
cies in [the] record that cast doubt on the constitutionality
of UT's policy, the answer is to order a trial, not to grant
summary judgment." Brief for Respondents 51; see also
*id.,* at 52–53 ("[I]f this Court has any doubts about how

the Top 10% Law works, or how UT's holistic plan offsets the tradeoffs of the Top 10% Law, the answer is to remand for a trial"). Nevertheless, the majority cites three reasons for breaking from the normal strict scrutiny standard. None of these is convincing.

## A

First, the Court states that, while "th[e] evidentiary gap perhaps could be filled by a remand to the district court for further factfinding" in "an ordinary case," that will not work here because "[w]hen petitioner's application was rejected, . . . the University's combined percentage-plan/ holistic-review approach to admission had been in effect for just three years," so "further factfinding" "might yield little insight." *Ante,* at 9. This reasoning is dangerously incorrect. The Equal Protection Clause does not provide a 3-year grace period for racial discrimination. Under strict scrutiny, UT was required to identify evidence that race-based admissions were necessary to achieve a compelling interest *before* it put them in place—not three or more years after. See *ante,* at 13–14 ("Petitioner is correct that a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity *before* it turned to a race-conscious plan" (emphasis added)); *Fisher I*, 570 U. S., at ___ (slip op., at 11) ("[S]trict scrutiny imposes on the university the ultimate burden of demonstrating, *before* turning to racial classifications, that available, workable race-neutral alternatives do not suffice" (emphasis added)). UT's failure to obtain actual evidence that racial preferences were necessary before resolving to use them only confirms that its decision to inject race into admissions was a reflexive response to *Grutter*,[16] and that UT did not seriously consider whether race-neutral means

---

[16] Recall that UT's president vowed to reinstate race-conscious admissions within hours of *Grutter*'s release. See Part I, *supra.*

would serve its goals as well as a race-based process.

B

Second, in an effort to excuse UT's lack of evidence, the Court argues that because "the University lacks any authority to alter the role of the Top Ten Percent Plan," "it similarly had no reason to keep extensive data on the Plan or the students admitted under it—particularly in the years before *Fisher I* clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review." *Ante*, at 9–10. But UT has long been aware that it bears the burden of justifying its racial discrimination under strict scrutiny. See, *e.g.,* Brief for Respondents in No. 11–345, at 22 ("It is undisputed that UT's consideration of race in its holistic admissions process triggers strict scrutiny," and "that inquiry is undeniably rigorous").[17] In light of this burden, UT had *every* reason to keep data on the students admitted through the Top Ten Percent Plan. Without such data, how could UT have possibly identified any characteristics that were lacking in Top Ten Percent admittees and that could be obtained via race-conscious admissions? How could UT determine that employing a race-based process would serve its goals better than, for instance, expanding the Top Ten Percent Plan? UT could

_____

[17] See also, *e.g., Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 720 (2007) ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny"); *Grutter* v. *Bollinger*, 539 U. S. 306, 326 (2003) ("We have held that all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny'"); *Gratz* v. *Bollinger*, 539 U. S. 244, 270 (2003) ("It is by now well established that 'all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized'"); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995) ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny").

not possibly make such determinations without studying the students admitted under the Top Ten Percent Plan. Its failure to do so demonstrates that UT unthinkingly employed a race-based process without examining whether the use of race was actually necessary. This is not—as the Court claims—a "good-faith effor[t] to comply with the law." *Ante*, at 10.

The majority's willingness to cite UT's "good faith" as the basis for excusing its failure to adduce evidence is particularly inappropriate in light of UT's well-documented absence of good faith. Since UT described its admissions policy to this Court in *Fisher I*, it has been revealed that this description was incomplete. As explained in an independent investigation into UT admissions, UT maintained a clandestine admissions system that evaded public scrutiny until a former admissions officer blew the whistle in 2014. See Kroll, Inc., University of Texas at Austin—Investigation of Admissions Practices and Allegations of Undue Influence 4 (Feb. 6, 2015) (Kroll Report). Under this longstanding, secret process, university officials regularly overrode normal holistic review to allow politically connected individuals—such as donors, alumni, legislators, members of the Board of Regents, and UT officials and faculty—to get family members and other friends admitted to UT, despite having grades and standardized test scores substantially below the median for admitted students. *Id.*, at 12–14; see also Blanchard & Hoppe, Influential Texans Helped Under-qualified Students Get Into UT, Dallas Morning News, July 20, 2015, online at http://www.dallasnews.com/news/education/headlines/20150720-influential-texans-helped-underqualified-students-get-into-ut.ece ("Dozens of highly influential Texans—including lawmakers, millionaire donors and university regents—helped underqualified students get into the University of Texas, often by writing to UT officials, records show").

UT officials involved in this covert process intentionally kept few records and destroyed those that did exist. See, *e.g.,* Kroll Report 43 ("Efforts were made to minimize paper trails and written lists during this end-of-cycle process. At one meeting, the administrative assistants tried not keeping any notes, but this proved difficult, so they took notes and later shredded them. One administrative assistant usually brought to these meetings a stack of index cards that were subsequently destroyed"); see also *id.*, at 13 (finding that "written records or notes" of the secret admissions meetings "are not maintained and are typically shredded"). And in the course of this litigation, UT has been less than forthright concerning its treatment of well-connected applicants. Compare, *e.g.,* Tr. of Oral Arg. 51 (Dec. 9, 2015) ("University of Texas does not do legacy, Your Honor"), and App. 281a ("[O]ur legacy policy is such that we don't consider legacy"), with Kroll Report 29 (discussing evidence that "alumni/legacy influence" "results each year in certain applicants receiving a competitive boost or special consideration in the admissions process," and noting that this is "an aspect of the admissions process that does not appear in the public representations of UT-Austin's admissions process"). Despite UT's apparent readiness to mislead the public and the Court, the majority is "willing to be satisfied by [UT's] profession of its own good faith." *Grutter*, 539 U. S., at 394 (KENNEDY, J., dissenting).[18]

————————

[18] The majority's claim that UT has not "had a full opportunity to respond to" the Kroll Report, *ante,* at 14, is simply wrong. The report was discussed in no less than six of the briefs filed in this case. See Brief in Opposition 19–20, n. 2; Reply to Brief in Opposition 6; Brief for Respondents 51, n. 9; Brief for Cato Institute as *Amicus Curiae* 8–12 (certiorari stage); Brief for Cato Institute as *Amicus Curiae* 12, and n. 4 (merits stage); Brief for Judicial Education Project as *Amicus Curiae* 5– 17. Not only did UT have an "opportunity to respond" to the Kroll Report—it *did in fact respond* at both the certiorari stage and the merits stage. See Brief in Opposition 19–20, n. 2 (explicitly discussing

Notwithstanding the majority's claims to the contrary, UT should have access to plenty of information about "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review." *Ante,* at 9. UT undoubtedly knows which students were admitted through the Top Ten Percent Plan and which were admitted through holistic review. See, *e.g.,* Supp. App. 157a. And it undoubtedly has a record of all of the classes in which these students enrolled. See, *e.g.,* UT, Office of the Registrar, Transcript—Official, online at https://registrar.utexas.edu/students/transcripts-official (instructing graduates on how to obtain a transcript listing a "comprehensive record" of classes taken). UT could use this information to demonstrate whether the Top Ten Percent minority admittees were more or less likely than the holistic minority admittees to choose to enroll in the courses lacking diversity.

In addition, UT assigns PAI scores to all students—including those admitted through the Top Ten Percent Plan—for purposes of admission to individual majors. Accordingly, all students must submit a full application containing essays, letters of recommendation, a resume, a

---

the "recently released Kroll Report"); Brief for Respondents 51, n. 9 (similar). And the Court's purported concern about reliance on "extrarecord materials," *ante,* at 14, rings especially hollow in light of its willingness to affirm the decision below, which relied heavily on the Fifth Circuit's own extrarecord Internet research, see, *e.g.,* 758 F. 3d, at 650–653.

The majority is also wrong in claiming that the Kroll Report is "tangential to this case at best." *Ante,* at 14. Given the majority's blind deference to the good faith of UT officials, evidence that those officials "failed to speak with the candor and forthrightness expected of people in their respective positions of trust and leadership," Kroll, Inc., University of Texas at Austin—Investigation of Admissions Practices and Allegations of Undue Influence 29 (Feb. 6, 2015), when discussing UT's admissions process is highly relevant.

list of courses taken in high school, and a description of any extracurricular activities, leadership experience, or special circumstances. See App. 212a–214a; 235a–236a; 758 F. 3d, at 669, n. 14 (Garza, J., dissenting). Unless UT has destroyed these files,[19] it could use them to compare the unique personal characteristics of Top Ten minority admittees with those of holistic minority admittees, and to determine whether the Top Ten admittees are, in fact, less desirable than the holistic admittees. This may require UT to expend some resources, but that is an appropriate burden in light of the strict scrutiny standard and the fact that all of the relevant information is in UT's possession. The cost of factfinding is a strange basis for awarding a victory to UT, which has a huge budget, and a loss to petitioner, who does not.

Finally, while I agree with the majority and the Fifth Circuit that *Fisher I* significantly changed the governing law by clarifying the stringency of the strict scrutiny standard,[20] that does not excuse UT from meeting that

_____

[19] UT's current records retention policy requires it to retain student records, including application materials, for at least five years after a student graduates. See University of Texas at Austin, Records Retention Schedule, Agency Item No. AALL358, p. 58 (Nov. 14, 2014), online at https://www.tsl.texas.gov/sites/default/files/public/tslac/slrm/state/schedules/721.pdf. If this policy was in place when UT resumed race-conscious admissions in 2004, then it still had these materials when petitioner filed this suit in 2008, and likely still had them at the time of *Fisher I* in 2013. At the very least, the application materials for the 2008 freshman class appear to be subject to a litigation hold. See App. 290a–292a. To the extent that UT failed to preserve these records, the consequences of that decision should fall on the University, not on petitioner. Cf. *Tyson Foods, Inc.* v. *Bouaphakeo*, 577 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 12) (allowing "a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records").

[20] See *ante,* at 10 ("*Fisher I* clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review"); 758 F. 3d, at 642 ("Bringing forward Justice Kennedy's dissent in *Grutter*,

heavy burden.  In *Adarand*, for instance, another case in which the Court clarified the rigor of the strict scrutiny standard, the Court acknowledged that its decision "alter[ed] the playing field in some important respects."  515 U. S., at 237.  As a result, it "remand[ed] the case to the lower courts for further consideration *in light of the principles [it had] announced.*"  *Ibid.* (emphasis added).  In other words, the Court made clear that—notwithstanding the shift in the law—the government had to meet the clarified burden it was announcing.  The Court did not embrace the notion that its decision to alter the stringency of the strict scrutiny standard somehow allowed the government to automatically prevail.

## C

Third, the majority notes that this litigation has persisted for many years, that petitioner has already graduated from another college, that UT's policy may have changed over time, and that this case may offer little prospective guidance.  At most, these considerations counsel in favor of dismissing this case as improvidently granted.  But see, *e.g., Gratz*, 539 U. S., at 251, and n. 1, 260–262 (rejecting the dissent's argument that, because the case had already persisted long enough for the petitioners to graduate from other schools, the case should be dismissed); *id.,* at 282 (Stevens, J., dissenting).  None of these considerations has any bearing whatsoever on the merits of this suit.  The majority cannot side with UT simply because it is tired of this case.

## IV

It is important to understand what is and what is not at

--------

the Supreme Court faulted the district court's and this Court's review of UT Austin's means to achieve the permissible goal of diversity"); *id.,* at 665, n. 5 (Garza, J., dissenting) ("I agree with the majority that *Fisher* represents a decisive shift in the law").

ALITO, J., dissenting

stake in this case. *What is not at stake* is whether UT or any other university may adopt an admissions plan that results in a student body with a broad representation of students from all racial and ethnic groups. UT previously had a race-neutral plan that it claimed had "effectively compensated for the loss of affirmative action," App. 396a, and UT could have taken other steps that would have increased the diversity of its admitted students without taking race or ethnic background into account.

*What is at stake* is whether university administrators may justify systematic racial discrimination simply by asserting that such discrimination is necessary to achieve "the educational benefits of diversity," without explaining—much less proving—why the discrimination is needed or how the discriminatory plan is well crafted to serve its objectives. Even though UT has never provided any coherent explanation for its asserted need to discriminate on the basis of race, and even though UT's position relies on a series of unsupported and noxious racial assumptions, the majority concludes that UT has met its heavy burden. This conclusion is remarkable—and remarkably wrong.

Because UT has failed to satisfy strict scrutiny, I respectfully dissent.